POWDER POWER TOOL CORPORA-
TION, Plaintiff-Appellee,

v.

POWDER ACTUATED TOOL COM-
PANY, Inc., and Frank J. Klunk,
Defendants-Appellants.

No. 11412.

United States Court of Appeals
Seventh Circuit.

Jan. 17, 1956.

Warren C. Horton, James A. Davis, Chicago, Ill., for appellants.

James P. Hume, Chicago, Ill., Harper Allen, Los Gatos, Cal., Wm. Marshall Lee, Chicago, Ill., for appellee.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

DUFFY, Chief Judge.

Defendants are charged with infringement of U. S. Patent No. 2,637,241 issued on May 5, 1953, to C. R. Webber, et al., covering "stud for explosive installations." The complaint also alleged unfair competition. Defendants denied any unfair competition and insisted the trial court had no jurisdiction as to that portion of plaintiff's asserted claim. Defendants alleged nonvalidity of the patent because of anticipation and lack of novelty or invention, and because of late insertion of claims after defendants' structure became known to plaintiff, and after it had been in public use for more than one year. Defendants also denied infringement.

The trial court did not file an opinion but adopted, without change, findings of fact and conclusions of law as prepared by plaintiff's attorneys. The court found the patent valid and to have been deliberately infringed since the early fall of 1950, and awarded treble damages including costs and attorney fees. The court also found that defendants were guilty of unfair competition and issued an injunction. The court held defendant Klunk was personally liable along with the defendant corporation for the acts complained of by plaintiff.

The claimed invention covered by Patent No. 2,637,241 relates to studs adapted for explosive installations used in connection with a hand-held tool. The tool has a bored barrel similar to the barrel of a gun. The stud is mounted in the bore of the tool separately and independently of the explosive charge which is usually a .22 cal. blank cartridge. The stud has a penetrating shank and an elongated head of greater diameter than the shank. It provided a shoulder which limited the penetration of the stud into the work piece. The head of the stud had a plain surface or a threaded surface, depending on whether it was desired to fasten a nut thereto or use the protruding head of the stud for other purposes. On the shank was placed a resilient washer referred to in the patent as a "deformable resilient frictional retainer." When the cartridge is fired, the stud is propelled through the bore of the tool and is caused to penetrate a predetermined distance into a hard surface such as concrete or steel. The patent in suit has but two claims[1] both of which are in issue.

---

1. 1. A stud for insertion into the surface of a work piece by its ejection through the bore of an explosively actuated driving tool; said stud comprising a body

The method of inserting fastening studs was not new with the patentees, and the gun or driving tool is the subject of separate patents, and somewhat similar guns or tools are made by a number of manufacturers other than plaintiff. In fact, powder actuated guns to drive studs into work pieces are more than thirty-five years old. The gun or tool itself is not an issue in this case.

Defendants moved to dismiss the cause of action based upon alleged unfair competition. One of the grounds for the motion was the court did not have jurisdiction of the subject matter of the alleged acts of unfair competition. Defendants' answer had specifically alleged the complaint failed to state a claim for unfair competition.

█ We are of the view that there is no support in the record for the trial court's finding of unfair competition, and such finding is clearly erroneous. We shall not discuss that issue in detail because, in our opinion, the jurisdictional question involved is controlling. Nevertheless, a somewhat detailed statement of the evidence seems to be in order, because of the trial court's conclusion that Frank Klunk, Sr. should be held personally liable, and also because of the court's conclusion that the infringement of the patent by defendants was wilful and deliberate.

Plaintiff is an Oregon corporation organized in 1947, and is the owner of the Webber et al. patent. It has been engaged in manufacturing and selling explosively operated tools and studs used in connection therewith. Up until late 1949 plaintiff was selling tools and studs acquired from the Iron Fireman Company. Up to December, 1949 plaintiff had one James C. Laulis working in Chicago as a factory representative. Laulis attempted to form a distributorship but failed in raising the necessary funds.

Frank J. Klunk, Sr. was a painting contractor. In December, 1949, his son Francis G. Klunk was looking for a business opening and his father attempted to assist him. The father had seen powder actuated tools made by plaintiff and sent a letter of inquiry to plaintiff as a result of which a meeting was arranged on March 1, 1950 in Chicago, attended by Daniel W. Creary, president of the plaintiff; Erickson, the chief engineer of plaintiff; Laulis; Klunk, Sr., and Klunk, Jr.

It was agreed that a corporation would be organized wherein Laulis was to own 49% of the stock, Klunk, Sr., 49% and Klunk, Jr., 2%. This was done. Defendant's corporate name was then selected with the approval of plaintiff's officers, and was chosen for its descriptive significance with respect to the powder actuation of stud-driving tools which defendants contemplated purchasing from plaintiff and others to be sold to customers. Defendant Powder Actuated Tool Company, Inc., was organized as an Illinois corporation on May 19, 1950.

Much argument appears in the briefs as to the relationship between plaintiff and defendant corporations. Plaintiff insists defendant corporation was its inter-

having a cylindrical head at one end and a surface penetrating shank at its other end, the head providing a shoulder to limit the penetration of the shank, and a deformable resilient frictional retainer on said shank and extending outwardly and around the perimeter of the shank, whereby said retainer when the stud is inserted in the bore of said explosively actuated tool will be deformed to frictionally retain said stud in any selected position along the bore and act as a seal for the explosive charge used to eject the stud.

2. A stud for insertion into the surface of a work piece by its ejection through the bore of an explosively actuated driving tool; said stud comprising a body having a cylindrical head at one end and a surface penetrating shank at its other end, the head providing a shoulder to limit the penetration of the shank, and a deformable resilient frictional retainer on said shank and extending outwardly of and substantially around the perimeter of the shank, whereby said retainer when the stud is inserted in the bore of said explosively actuated tool will be deformed to frictionally retain said stud in any selected position along the bore and having a sealing effect on the explosive charge used to eject the stud.

im distributor. In its complaint, plaintiff designated the defendant corporation as its sales representative. Defendant insists that the relationship was manufacturer and dealer, and that it was understood that defendant corporation would purchase from plaintiff tools and studs manufactured by it, and would be billed therefor at a 46% discount. Whatever may be the proper terminology for the business relationship, all parties are agreed that it was to be of a temporary nature on a trial basis, and that after three or four months either party could terminate the relationship. Certainly defendant company was not an agent of plaintiff—it merely bought tools and studs from plaintiff and sold them. There is no evidence of any agreement or understanding that if such relationship were terminated that defendant corporation would not be permitted to continue business under its corporate name. Plaintiff admits, and the Court so found, that after the relationship theretofore existing had been terminated, it was agreed defendant company was to have the exclusive right, as a dealer, to sell plaintiff's products to the governments of the State of Illinois and the City of Chicago.

Klunk, Sr. advanced the money to put the defendant corporation in operation, even lending to Laulis the money for his share of the capital stock. Plaintiff sold and delivered to defendant company $14,000 worth of inventory. No claim is made that title to any items in the inventory remained in the plaintiff. Defendant company continued to sell tools and studs purchased from the plaintiff during the months of March, April, May and June, 1950. Laulis drew from the defendant company a salary of $500 a month plus an expense account. Neither Klunk, Sr. nor Klunk, Jr. received any money or income from defendant company. No rent was paid by defendant company to Klunk, Sr. who owned the premises which it occupied. Laulis was in active charge of the conduct of defendant company's business, and he was the only one of defendant's officers or stockholders who had had any previous experience

in powder activated tools or studs used in connection therewith. Klunk, Sr. did not take any active part in the conduct of the business until difficulties arose between plaintiff and the defendant company.

The first complaint of defendants was that Thomas Hoist Company of Chicago, who sold plaintiff's tools and studs, was selling these items to the trade at a large discount. In response to defendant's protest, plaintiff replied it could do nothing about it, and would continue to sell its products to Thomas Hoist Company. Thereafter, in May, 1950, Laulis, the active executive officer of defendant company, began to absent himself from defendants' business for days at a time. Klunk, Sr. became concerned about this, and in the latter part of May, 1950, made a trip to Portland, Oregon, to talk with Mr. Creary, president of the plaintiff.

Klunk, Sr. spent one morning at plaintiff's plant in Portland. The greater portion of that time was consumed in discussing the problems of defendant company. Mr. Creary took Klunk through plaintiff's plant and then on a tour of Portland. Klunk did not seek information as to how the studs were manufactured, but plaintiff claims that he obtained such information while making the trip through the plant.

Creary told Klunk, Sr. that he could do nothing about Thomas Hoist Company selling goods at a discount, and that there was nothing he could do about the irresponsible actions of Mr. Laulis. Klunk, Sr. then returned to Chicago, visited the Thomas Hoist Company and endeavored to have it follow a uniform price for plaintiff's goods. This it refused to do. Klunk, Sr. then telephoned to Creary in Portland and told him that defendant could not successfully carry on its business with such competition. He offered to sell the entire business of defendant company to plaintiff, turning over the entire business including the corporate name and good will, the entire stock of inventory and all company records, if plaintiff would pay to defendant the amount which had been invested in the business which was some

$3,000 over and above the inventory and accounts receivable. Creary refused this proposal.

On July 12, 1950, Klunk, Sr. sent a written proposal to plaintiff, listing by number and quantity, tools and equipment which it was willing to sell to the "new company" at defendant's cost price. In the computation of the sales price, a deduction was made for the amount currently due from defendant company to plaintiff, leaving a net amount of $1,987.-21 to be paid for the listed items of inventory.

On July 1, 1950, a new company was organized known as the Powder Tools Sales Company. This company was not owned by plaintiff, but was owned personally by Creary and Erickson, officers of plaintiff. Creary wrote to defendants stating a new company had been organized, and that Mr. Chatterton who had been selling plaintiff's products for Thomas Hoist Company, would be manager of the new company and would call on defendant company to take over the property listed in defendant's offer.

On July 15, 1950, Chatterton and one Webber acting on behalf of the new company, appeared at defendant's office to make payment for the goods, but insisted that there should be turned over to them a complete list of defendant's customers, and also demanded a list of guarantee cards bearing the names of customers to whom guns had been sold by the defendant. Both Klunk, Sr. and Klunk, Jr. refused to turn over the list of defendant's customers, but they did turn over the warranty cards which they had in their possession.

There was some evidence to support the court's finding that it was understood defendant company could withhold the names of some of its customers until such time as it was able to collect accounts due from them. Defendant company received from Chatterton a check for $1,987.21 which was the exact balance indicated on the itemized list of goods which defendant company offered to sell.

Thereafter, defendant company continued to purchase tools and studs from Powder Tools Sales Company; the amounts due therefor were billed to defendant Powder Actuated Tool Company, Inc. and copies of such invoices were sent to plaintiff which made no objection to defendant continuing the use of its corporate name. In fact, prior to the filing of this suit, no such objection was made at any time. However, Chatterton did write letters to customers of defendant threatening that if they purchased from defendant he would be forced to cancel guarantees, that he would refuse to service tools purchased from defendant, and would take care only of customers who purchased tools, pins, and equipment from Powder Tools Sales Company.

■■ We shall first consider whether the trial court had any jurisdiction to try the issue of alleged unfair competition. One possible basis for jurisdiction is Title 28 U.S.C. § 1338(b) which provides: "The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trademark laws." Thus, the non-federal claim of unfair competition in the case at bar must be "related" to the federal claim under the patent laws. It must appear that both the federal and non-federal causes rest upon substantially identical facts. Landstrom v. Thorpe, 8 Cir., 189 F.2d 46, 26 A.L.R.2d 1170. See also Hurn v. Oursler, 289 U.S. 238, 248, 53 S.Ct. 586, 77 L.Ed. 1148; French Renovating Co. v. Ray Renovating Co., 6 Cir., 170 F.2d 945, 947. The acts of which plaintiff complains occurred, if at all, two or three years before the patent in suit issued. Defendants had no previous notice that the patent was pending. We hold that the alleged acts of unfair competition were not related to the patent which was issued several years thereafter. Strey v. Devine's, Inc., 7 Cir., 217 F.2d 187, 189.

■■ The only other possible basis for jurisdiction by the trial court of the

issue of unfair competition, is diversity of citizenship. "The rule is firmly settled that the mere allegation of the jurisdictional amount when challenged as it was here is not sufficient and that the burden is upon the plaintiff to substantiate its allegation." Seslar v. Union Local 901, Inc., 7 Cir., 186 F.2d 403, 406, 407, 30 A.L.R.2d 593. Here the complaint did not allege the jurisdictional amount. The court did not make any finding as to the existence of the jurisdictional amount. However, in the conclusions of law, it was stated that the court had jurisdiction of the subject matter of the action and of the parties to the action. Nevertheless, the record discloses that the jurisdictional amount was neither alleged nor proved. It follows the court did not have jurisdiction to decide the issues as to unfair competition. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135; Topping v. Fry, 7 Cir., 147 F.2d 715. Defendants' motion to dismiss plaintiff's claim based upon alleged unfair competition should have been granted.

Personal Liability of Frank J. Klunk, Sr.

At the close of plaintiff's case, defendants moved to dismiss the complaint as to Frank J. Klunk. The trial judge stated: "Well, I don't think you have shown very much liability so far as he is personally concerned, but I will overrule your motion for the present." Nothing appears in the record as to why the trial judge changed his view. However, the findings of fact and conclusions of law prepared by plaintiff's counsel included a favorable ruling on every demand which the plaintiff had made in this lawsuit including personal liability on the part of Frank J. Klunk. The trial court adopted the findings and conclusions as presented.

Up until June, 1950, Laulis was the active executive officer of defendant company, directing its sales and practices. Klunk, Sr. had acted in an advisory capacity. The new stud and retaining washer which plaintiff claims to infringe were designed primarily by Klunk, Jr. Klunk, Sr. never sold studs or washers

for his own account. Defendant company was not organized to permit Klunk, Sr. to profit from infringement or to hide his personal liability under a corporate shell. When defendant company was organized there was no patent in existence, and defendants had no knowledge that a patent might issue, hence the company could not have been organized to carry on a wilful and deliberate infringement. Klunk, Sr. did nothing beyond the scope of his duties as president of the defendant company. No suggestion is made that the company is insolvent. We think pertinent the statement of this Court in Cazier v. Mackie-Lovejoy Mfg. Co., 7 Cir., 138 F. 654, 656: "* * *, a corporation, can act only through its officers and agents. We find nothing in the record to show that the [defendant] Deknatel acted beyond the ordinary scope of his office * * * [United Nickel Co. v. Worthington, C.C., 13 F. 392; Boston Woven Hose Co. v. Star Rubber Co., C.C., 40 F. 167 * * *.".].

■ In Dangler v. Imperial Machine Co., 7 Cir., 11 F.2d 945, 946, this court said: "* * * respecting the liability of officers of a corporation for its infringements * * *. If the officers act merely as officers, they are not liable jointly with the corporation. * * * we adhere to the Cazier v. Mackie-Lovejoy Mfg. Co. decision [7 Cir., 138 F. 654], and hold that, in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction." In our opinion that part of the judgment holding Frank J. Klunk, Sr. personally liable is clearly erroneous. Trico Products Corp. v. Ace Products Corp., D.C., 30 F.2d 688, 689.

Question of Infringement.

The application for the patent in suit was filed December 31, 1949. The file history discloses it had a rather tortuous three-year trip through the Patent Office. As filed, it had eight Claims and one sheet of drawings bearing Figs. 1 to 6 inclusive. The 8 original Claims were

rejected, and Claims 9 to 17 were substituted. These were rejected and on September 19, 1952 applicants filed an amendment cancelling Claims 9 to 17 and substituting Claims 18 to 20. On January 7, 1953 the examiner rejected Claims 18 to 20 as being "aggregative" in that they claimed "the stud in combination with the tool" and as being indefinite. Claims 18 to 20 were cancelled and Claims 21 and 22 were substituted. These two Claims became the Claims 1 and 2 of the patent in suit. Figs. 5 and 6 of the original drawing were cancelled on April 1, 1953.

■ Each of Claims 18 to 20 included a frictional retainer holding the stud in the bore of the gun barrel "in a predetermined position", but did not ascribe any sealing function to the retainer. In fact, over a period of three years during which time 20 Claims were presented to the Patent Office, not one ascribed any sealing function to the washer, or included the word "seal" or any equivalent thereof. Those 20 Claims, despite the fact that Claim 19 was substantially identical with Patent Claims 1 and 2 except for the limitation to "act as a seal" or to have a "sealing effect", were steadfastly refused by the examiner and were cancelled by applicants. Where an applicant is compelled to narrow his Claims by inserting a limitation in order to obtain the patent, that limitation cannot be disregarded. Hence, the retainer of Patent Claim 1 must

(1) extend outwardly "and around the perimeter of the shank", whereby

(2) to "act as a seal"

and the retainer of Patent Claim 2 must

(1) extend outwardly "and substantially around the perimeter of the shank", and

(2) have a "sealing effect".

From representations made to the Patent Office by applicants for the patent in suit, it is clear that "substantially around" as used in Patent Claim 2 is something less than "completely around" and thus differs from Patent Claim 1. The law requires the two Claims to distinguish from each other.

■ Defendant's retainer or washer is substantially star-shaped and centrally apertured. It therefore extends completely around the shank as required by Claim 1, but the spaces between the four points of the star-shaped retainer provide gas-escape openings and, therefore, prevent the accused retainer from acting as "a seal" as required by Claim 1. Furthermore, the accused retainer cannot be said to extend less than completely around the shank as required by Patent Claim No. 2. Thus defendant's accused device does not embody the limitations introduced after repeated rejections of Claims presented in the patent application. Such limitations must be deemed essential features of the claimed invention. Defendant's retainer, not having either the indispensable limitation of acting as "a seal" as required by Claim 1, or extending less than completely around the stud shank as required by Claim 2, does not infringe either of those Claims.

### Validity.

■ In spite of our determination of non-infringement we follow the "better practice" and turn now to the question of the validity of the claims. Sinclair & Carroll Co., Inc., v. Interchemical Corporation, 325 U.S. 327–330, 65 S.Ct. 1143, 89 L.Ed. 1644; Holland Co. v. American Steel Foundries, 7 Cir., 190 F.2d 37, 39.

The elements, in combination of the patented stud consist of (1) a cylindrical head at one end of the body of the stud; (2) a surface penetrating shank at the other end; (3) a shoulder provided by the head to limit the penetration of the shank; and (4) a deformable resilient frictional retainer on the shank extending outwardly and around (Claim 1), or substantially around (Claim 2) the perimeter of the shank. Admittedly all of these elements were old.

■■ To be patentable, a combination of individually old elements must be new, and those elements must cooperate to produce a new and unexpected or unob-

vious result. Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. Plaintiff necessarily places great emphasis upon the washer or retainer in urging that a new and unexpected result is obtained. However, the retainer contributes only to the ballistic or projectile characteristics of the stud by retaining it within the gun barrel bore in operative relationship to the cartridge before firing, and by serving as a "seal" for the explosive charge used to eject the stud upon the firing of the gun or tool.

To show invention plaintiff cites a number of "improvements and betterments" which it claimed resulted from the combination of elements. But all such "improvements" depend upon the cooperation of the gun or tool. Since neither Claim includes the gun or tool, its breech, or other part of the gun structure, the claimed beneficial results do not result from a cooperation of the Claims in suit. We are unable to find the new or unexpected result as is required to support patentability of the combination.

We cannot give weight to the argument based on commercial success. The increase in sales was stated only percentage-wise which means little. In this connection it is interesting to note that plaintiff discontinued the manufacture of the circular washer as described in the patent in suit, and adopted instead a plastic retainer which has corrugations or scallops at the edge similar to that manufactured by defendant, and which permit the escape of gases. This new gas-escape retainer adopted by plaintiff, and shown in plaintiff's Exhibit 7, would seem to be a complete abandonment of the sealing washer of the patent in suit.

We also think the claims of the patent in suit are invalid for lack of invention over the prior art. It would unnecessarily prolong this already lengthy opinion to do more than cite Temple Patents No. 1,365,870 and 2,470,117; Miller Patent

No. 1,388,363; Febrey Patent No. 2,050,-047; Turechek Patent No. 2,380,204; Goodchild, Jr. Patent No. 2,322,709; C. E. Stivers Patent No. 873,628.

Judgment reversed with directions to dismiss the complaint.