**MANNIX COMPANY, Limited, Appellant,**

v.

**M. A. HEALEY, Individually, and M. A. Healey, doing business as Better Welding Company, Appellee.**

**No. 20907.**

United States Court of Appeals
Fifth Circuit.

March 3, 1965.

**1010**

Davidson C. Miller, Washington, D. C., Charles L. Stephens, J. A. Gooch, Cantey, Hanger, Gooch, Cravens & Scarborough, Fort Worth, Tex., George N. Robillard, Washington, D. C., for appellant.

Howard E. Moore, Dallas, Tex., Heard L. Floore, Fort Worth, Tex., for appellee.

Before BROWN and WISDOM, Circuit Judges, and ESTES, District Judge.

ESTES, District Judge.

Appellant, Mannix Company Limited (Mannix), a Canadian Corporation, Calgary, Alberta, is here appealing from the dismissal of its action against appellee, M. A. Healey, individually and doing business as Better Welding Company, Fort Worth, Texas (Healey), for an injunction and damages for alleged infringement of Claims 1, 2, 10 and 11 of the J. C. Stein-Louis B. Franco Patent No. 2,921,390 (Stein-Franco Patent) and Claim 1 of the J. W. Christoff Patent No. 2,961,972 (Christoff Patent).

This suit was instituted on November 30, 1960, one day after the Christoff Patent was issued.

Appellee's defense to Mannix's amended complaint was that the claims of both patents were invalid and not infringed. After an extended trial before the district court, with voluminous exhibits, the trial judge found that the four litigated claims of the Stein-Franco Patent were invalid and not infringed and that the sole claim (Claim 1) of the Christoff Patent was valid but not infringed. The trial court entered judgment that plaintiff Mannix recover nothing and dismissed the complaint.

We agree with the trial court's holding that the Stein-Franco Patent is invalid. We also hold that the Christoff Patent is invalid and, therefore, the judgment of the trial court dismissing the complaint should be affirmed.

We are dealing with improvement patents in the "undertrack art"—ground working equipment for railroad road bed maintenance—encompassing both undertrack (ballast) plows and sleds. An undertrack plow is a device for skeletonizing or reconditioning existing track road bed by removing fouled (compacted) ballast therefrom. The undertrack plow is inserted between the road bed and the ties, to which the track rails are affixed, and is secured by cables to and towed by a locomotive. The plow raises the ties from the road bed ahead of it, supports these ties and track rails as it passes underneath, separates and displaces the fouled ballast from the road bed to the side of the track by the ends of the ties, and finally allows the ties and track rails to resettle onto the road bed behind it. An undertrack sled is similar in design and operation to the plow, with the plow's scraping blades replaced by ballast levelling blades in the sled. Sleds are used to raise and support the track and distribute original ballast in laying new track or renewal ballast following skeletonizing with a plow.

The "undertrack art" dates back at least to 1903 and embraces numerous patents,[1] publications and prior use devices. The devices here in suit have their beginnings in the device conceived by A. W. Banton, Sr. and his sons, A. W., Jr. and Paul, around 1947. Prior to filing a patent application on September 17, 1949,[2] A. W. Banton, Sr., who was an experienced service engineer for manufacturers of railroad equipment contacted the Chief Engineer of the Santa Fe Railway (Blair), exhibited to him a model of the Banton device and photographs thereof, and discussed the possi-

---

1. Appellant attempts to minimize the teachings of the prior art patents by referring to them as "paper art" which had not been put to commercial use, manufactured or sold. This is irrelevant to the question whether the *disclosures* therein constituted anticipation. Edward Valves, Inc. v. Cameron Iron Works, Inc. (5 Cir., 1961), 286 F.2d 933, 939; Tillotson Manufacturing Co. v. Textron, Inc., Homelite (6 Cir., 1964), 337 F.2d 833, 837.

2. A. W. Banton, Jr.—Paul Banton Patent No. 2,571,183 issued October 16, 1951.

bility of developing an undertrack plow. Blair referred Banton to John R. Rushmer, Chief Roadway Engineer for Santa Fe, who became interested in the device and thereafter was instrumental in a reduction to practice in this country of the first undertrack plow. Banton sold Santa Fe a license with the understanding that the benefits of any improvements as a result of Santa Fe's making and using the plow would inure to him. Santa Fe first constructed and tested a plow in early 1950. A second plow—with modifications dictated by experience with the test plow—was built in late 1950 and this plow has been publicly and extensively used on the Santa Fe system since 1951.

In early 1952, Louis B. Franco, Manager of the Railroad Division of Mannix, a contracting firm, sought information from Rushmer about Santa Fe's plow and discussed the feasibility of using a similar device in Mannix's construction of a new railroad in Labrador. Rushmer prepared and furnished Franco drawings of an undertrack sled. About the same time an article was published in Modern Railroads magazine regarding Santa Fe's successful use of its plow. On September 22, 1952, Franco witnessed Santa Fe's plow in operation at Winslow, Arizona and took photographs and motion pictures thereof, which he exhibited to railroads in Canada. Four days later (September 26, 1952) Franco first tested the sled that Mannix built from Rushmer's plans. Banton also had a plow constructed which was tested on the Santa Fe system under Rushmer's supervision in April and May, 1953.

As late as April, 1954, Franco was receiving information from Rushmer concerning Santa Fe's further development and refinement of its plow; and on June 23, 1954, Franco first applied for his patent in Canada. The potential of this undertrack equipment stimulated great interest in the railroad industry. The publicity attending Santa Fe's plow engendered widespread inquiry. Santa Fe freely exhibited the construction and operation of its plow to interested concerns,

and called attention to the Banton Patent from which it stemmed.

Appellee Healey, engaged in the railroad maintenance and repair business, was approached by T. & N. O. and Missouri-Pacific railroads to build undertrack plows for them. As a result, Healey entered a licensing agreement with Banton on April 15, 1960, obtained from Santa Fe the latest drawings and specifications for its plow, and made therefrom and sold the two undertrack plows which are the devices accused of infringement.

In determining the question of the validity of the two patents in suit, two Supreme Court opinions establish guidelines applicable here. Sears, Roebuck & Co. v. Stiffel Co. (1964), 376 U.S. 225, 229–230, 84 S.Ct. 784, 787–788, 11 L.Ed.2d 661, states:

> "The grant of a patent is the grant of a statutory monopoly * * * meant to encourage invention by rewarding the inventor with the right * * * to exclude others from the use of his invention. * * * But in rewarding useful invention, the 'rights and welfare of the community must be fairly dealt with and effectually guarded.' Kendall v. Winsor, 21 How. 322, 329 [16 L.Ed. 165] (1859). To that end the prerequisites to obtaining a patent are strictly observed. * * * (A) genuine 'invention' or 'discovery' must be demonstrated 'lest in the constant demand for new appliances the heavy hand of tribute be laid on each slight technological advance in an art.' Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 92 [62 S.Ct. 37, 86 L.Ed. 58] (1941) * * *."

Atlantic Works v. Brady (1883), 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438, cited in Stiffel Co., supra, adds:

> " * * * It was never the object of (the patent) laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or op-

erator in the ordinary progress of manufacturers. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. * * *"

## THE STEIN–FRANCO PATENT [3]

The Stein-Franco Patent and the Mannix device embody:

(a) a flat elongated perforated metal sheet,[4] with the perforations situated above the spaces between each adjacent pair of blades;

(b) a pair of tie engaging and supporting raised strips (runners) on top of the sheet and extending from front to rear; and

(c) a plurality of blade members (at least three) projecting downwardly therefrom and disposed in a "V" pattern one behind the other from front to rear. The record shows beyond any doubt, and the trial court found, that these elements [5] singly and in combination are anticipated by the prior art.

Mannix contends that the novelties in the improvement combination claims of the Stein-Franco Patent are the additional specifications therein for:

(1) "a keel extending generally parallel to said strips and projecting below the bottom edges of said blade members"; and

(2) "the most rearwardly disposed blade member projects downwardly beyond the bottom edge of the most forwardly disposed blade member."

The declared purpose of the "keel" and "deeper rear blade" was for inherent directional control and stability of the plow as it was towed under the track.[6]

3. J. C. Stein and Louis B. Franco applied for an improvement patent on an under-track plow in Canada on June 23, 1954, and on October 7, 1954 in the United States. The patent was issued on January 19, 1960 to Stein and Mannix, which acquired the interest of co-applicant Franco by mesne assignment. Claim 1 disclosed a device:

"* * * comprising

"a flat elongated perforated metal sheet,

"a pair of raised strips (runners) fixedly secured to the upper surface of said sheet and extending from front to rear therealong,

"a plurality of blade members disposed one behind the other and projecting downwardly from said perforated metal sheet, said blade members being inclined to the front-to-rear axis of the device as defined generally by the raised strips, and

"a keel extending generally parallel to said strips and projecting below the bottom edges of said blade members."

Dependent Claim 2 added the specification that there be at least 3 blade members employed with the perforations in the sheet situated above the spaces between each adjacent pair of blades. Dependent Claim 10 adds the specification that "* * * the most rearwardly disposed blade member projects downwardly beyond the bottom edge of the most forwardly disposed blade member." Claim 11 merely omits the keel from the specification of the combination.

Franco was employed by Mannix at the time applications for the patent were filed in Canada and the United States.

4. The perforations permit excess ballast which "foams" over the top of the device as a result of the blade action to drop through the sheet in front of succeeding blades.

5. also present in the Healey device.

6. However, the commercial embodiment of the Mannix device obviously also gets directional control and stability from rigid attachment of the plow to an "auto track" unit running on the railroad track thereabove. Neither the keel nor deeper rear blade is in the accused device. It gets control and stability from "guide rails" affixed to the top of either side of the metal sheet to encounter the ends of the ties.

The trial court made the following findings of fact, supported by ample evidence: with respect to the "keel",

" 'A keel extending parallel to said (raised) strips and projecting below the bottom edges of said blade members' is disclosed in the Wild and Williams Patents, and in the Banton prior use device. In view of the Wild and Williams disclosure of such keel member, it would be obvious to a person hav(ing) ordinary skill in the art, and would not constitute invention, to incorporate such expedient in the prior use Santa Fe plow, or in the devices shown in the prior art * * *";

and with respect to the "deeper rear blade",

"This element is disclosed in the prior use Santa Fe and Banton plows, and in the Clemons, Thurston, Snyder and Fogelberg Patents. The Clemons, Thurston and Snyder Patents show a rear blade projecting downwardly, or adapted to project downwardly, below the bottom edge of a most forwardly disposed blade in earth working equipment, to-wit, road graders, and road working sleds. This is a pertinent art to that of the patents-in-suit, and to incorporate this feature, as taught in said patents in an undertrack plow would be obvious to a person having ordinary skill in the art, at the time the alleged inventions were made, and would not constitute invention."

■ The record convinces us that the trial court was correct in holding that

Claims 1, 2, 10 and 11 of the Stein-Franco Patent are invalid and void because anticipated by prior art patents, publications, prior knowledge and public use, and because the subject matter of such claims does not represent discovery or patentable invention.

## THE CHRISTOFF PATENT [7]

■ We now consider the validity of the single claim of Christoff's patent.[8] While appellee did not file a cross appeal from the trial court's ruling that the Christoff Patent is valid, the patentability of the claim was asserted by appellant and invalidity was asserted by appellee in the briefs, and this issue was discussed on oral argument before the Court. The appeal brought up the whole record and all questions going to the correctness of the judgment. If for any reason, including invalidity of the patent, the judgment of the trial court dismissing the suit is correct, the judgment should be affirmed even though it was based on non-infringement. Guiberson Corporation v. Equipment Engineers, Inc. (5 Cir., 1958), 252 F.2d 431; Graham v. Cockshutt Farm Equipment (5 Cir., 1958), 256 F.2d 358; Stelos Co. v. Hosiery Corp. (1935), 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414; Maytag Company v. Murray Corporation of America (6 Cir., 1963), 318 F.2d 79.

J. W. Christoff's original patent application contained five claims. After two rejections by the Patent Office and amendments by Christoff, the patent was issued on a single claim specifying an undertrack device having a pair of upper runners for engagement with the undersurface of the ties, " * * * said run-

7. J. W. Christoff applied for an improvement patent on an undertrack plow and sled device on March 26, 1957. The patent was issued on November 29, 1960 to Mannix by mesne assignment from Christoff, who is Vice-President and General Manager of Mannix's wholly owned U. S. subsidiary, Mannix International, Inc., and the one charged with the responsibility for the promotion of Mannix's commercial embodiment of the patents in suit.

8. "In an under-track device for handling ballast under railroad tracks and ties, said device being of the type comprising a generally flat framework adapted to be drawn along between the roadbed and the ties while supporting the weight of said ties and a span of track and having a pair of upper runners for engagement with the undersurfaces of the ties, said runners curving convexly upwards substantially to complement the natural curve of the line of tie bottoms of such span of track and presenting a surface of uniform frictional characteristics throughout their length."

ners curving convexly upwards substantially to complement the natural curve of the line of tie bottoms of such span of track and presenting a surface of uniform frictional characteristics throughout their length." Christoff asserted before the Patent Office that " * * * the expression 'uniform frictional characteristics' was introduced to distinguish over such constructions as * * *" the J. E. Tobin Patent No. 1,313,353 (1919), which exposed the bottoms of the ties passing thereover to three different frictional surfaces (i. e., runners, propelling chains, and rollers), and that in the Christoff patent drawings "these uniform frictional characteristics are achieved by the use of anti-friction rollers." [9]

Christoff admitted at the trial that the use of any single material for the entire runner—such as the second-hand railroad rails used for the accused runners— would present a surface of "uniform frictional characteristics" as specified in the claim. Assuming this interpretation, the claim defines only convexly curved runners made of a single material. This is clearly anticipated by prior art references such as the Maurice-Henri LeMaire (French) Patent No. 748,676 (1933), which depicts convexly curved runners presenting a single surface material conforming to the natural curve of the line of tie bottoms. The LeMaire Patent was not cited in the Christoff Patent file. In addition, we are of the opinion that the convexly curved runners of the Christoff Patent are substantially equivalent to the flat-surfaced runners inclining from the front to a level middle section and declining to the rear, found in the prior art, Santa Fe and Banton plows.

The trial court found that the Christoff Patent:

" * * * is valid if limited to the specific construction of the runners curving convexly upwardly with metal rollers on the upper surfaces of the runners extending from end to end thereof. This arrangement is not specifically shown in prior art patents or prior use devices, although the Tobin and Sparks Patents, and the Banton prior use plow employed metal rollers on the upper surfaces of the runners, and the Tobin, LeMaire and Sparks Patents, and the magazine publication, Railway Engineering and Maintenance for July 1951, logically suggest runners curving convexedly upwardly underneath the track."

"Rollers on the upper surfaces of the runners extending from end to end thereof" [10] would not make the Christoff curved runners a patentable improvement over the prior art. As early as 1910 the W. F. Sparks Patent No. 966,613, in disclosing an undertrack device, spoke of runners on the upper surface, which "in order to cause the ties to more readily ride up the inclined forward ends * * are preferably provided with a series of tie engaging rollers * * *, for which there may be any suitable number * *." In Patent No. 1,083,302 (1914), Sparks again disclosed " * * * a series of anti-friction rollers * * *, for which there may be any suitable number * * *."

The Tobin Patent depicted a pair of convexly curved runners from front to rear with a "moving chain" on the front incline, and "rollers" down the rear decline, further specifying that "if desired one or more * * * rollers * * * can be interposed between the inner ends of the roller frames thereby providing substantially continuous roller tracks from the front to the rear end of the machine." Christoff obviously took from the Tobin drawings the convexly curved runners and from the Tobin Specifications the "continuous roller tracks from the front to the rear end."

Likewise, the T. I. S. Fogelberg et al. Patent No. 2,725,016, issued in 1955 on

---

9. Photographs of the Mannix device in its brochure do not show rollers on the upper runners, and there are no rollers on the runners of the accused device.

10. The Patent Office rejected Christoff's claim specifically covering runners with a continuous roller surface.

application filed in 1951, disclosed tie runners composed of "endless chains" or conveyors running on rollers to reduce friction. The teachings of this patent were also published in an article in Railway Engineering and Maintenance magazine in 1951.

In addition, the trial court found on sufficient evidence that the tie runners on the Banton plow " * * * as originally tested * * * had rollers thereon from front to rear intended to reduce friction * * *. The rollers were removed and were replaced by rail tie runners."

■ It is apparent from the summary of the prior art recited above that the result produced by the Christoff Patent was taught by, and the elements thereof were singly and in combination revealed in, the prior art, and that it does not represent inventive combination.

The trial court stated in his letter opinion: "The validity of the above patent is doubtful, but in view of the statutory presumption I think the benefit of the doubt should go to the plaintiff * *". Judge Hutcheson's opinion in Butex Gas Co. v. Southern Steel Co. (5 Cir., 1941), 123 F.2d 954, 955, quoted by this court in the recent case of Hughes Tool Co. v. Varel Manufacturing Co., 336 F.2d 61, 66, states the rule regarding the statutory presumption of 35 U.S.C.A. § 282 applicable to the facts of this case:

"" * * * The presumption of patentability which attends the grant of a patent cannot survive in the face of undisputed facts showing that there is no invention. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 31, 50 S.Ct. 9, 74 L.Ed. 147."

See also: Jeoffroy Mfg. v. Graham (5 Cir., 1955) 219 F.2d 511; Samuelson v. Bethlehem Steel Company (5 Cir., 1963), 323 F.2d 944.

■ We recognize the patentability of an improvement combination the constituent elements of which are singly revealed by the prior art. However, mere absence of the entire combination from a single prior art reference does not invest

with patentability an aggregation of obviously old and well known elements functioning together in their usual manner to produce an old and readily foreseeable result which does not exceed the sum of the individual old combinations. Great Atlantic & Pacific Tea Co. v. Supermarket Corp. (1950), 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Anthony v. Ranco Incorporated (5 Cir., 1963), 316 F.2d 509; Little Mule Corporation v. The Lug All Company (5 Cir., 1958), 254 F.2d 268; Fritz W. Glitsch & Sons v. Wyatt Metal & Boiler Works (5 Cir., 1955), 224 F.2d 331, 335. This is especially true where, as here, the same result flows naturally from the teachings of the prior art. Servo Corporation of America v. General Electric Company (4 Cir., 1964), 337 F.2d 716, 719. No new benefit resulted from the Mannix device combining elements and functions old in the art, which would have been obvious to a person having ordinary skill in the art. 35 U.S.C.A. § 103.

■ While commercial success can be an evidence of invention, Glikin v. Smith (5 Cir., 1959), 269 F.2d 641, 652, we are of the opinion that the commercial success of the Mannix device is attributable to factors not indicative of invention. Mannix's whole enterprise in undertrack plows is rooted in information its Louis B. Franco obtained from Santa Fe. In any event, commercial success is neither a substitute for invention nor sufficient evidence of it where lack of invention is so plain as here. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co. (1944), 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; Toledo Pressed Steel Co. v. Standard Parts (1939), 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334; Servo Corporation of America v. General Electric Company, supra.

The District Court's "doubtful" finding that the Christoff Patent is valid "if limited * * * to rollers * * *" is without substantial evidence to support it, is against the overwhelming facts of record showing that there is no invention, misapprehends the legal effect of the facts, and is clearly erroneous. Sanders

v. Leech (5 Cir., 1946), 158 F.2d 486, 487; Galena Oaks Corporation v. Schofield (5 Cir., 1954), 218 F.2d 217, 219; Guiberson Corporation v. Equipment Engineers, Inc., supra.

We hold that the Christoff Patent is invalid as anticipated and for want of inventive combination.

Having determined that the claims of appellant's patents are invalid [11] the judgment of the District Court dismissing appellant's complaint is

Affirmed.

11. This disposition renders unnecessary determination of infringement issues.