**ERIE TECHNOLOGICAL PRODUCTS, INC., Plaintiff-Appellant,**

v.

**DIE CRAFT METAL PRODUCTS, INC., Defendant-Appellee.**

**No. 18615.**

United States Court of Appeals, Seventh Circuit.

May 8, 1972.

Rehearing Denied June 23, 1972.

---

**6**

Ralph Hammar, Erie, Pa., George E. Bullwinkel, Chicago, Ill., for plaintiff-appellant.

Keith J. Kulie, Chicago, Ill., for defendant-appellee.

Before FAIRCHILD and PELL, Circuit Judges, and GORDON, District Judge.[1]

1. District Judge Myron L. Gordon of the Eastern District of Wisconsin is sitting by designation.

2. No. 2,766,510, "Method and Apparatus for Making Condensers," issued October 16, 1956 to Erie Resistor Corporation,

FAIRCHILD, Circuit Judge.

Appeal from a judgment of the district court deciding that certain claims of a patent[2] are valid, but the manufacture, use, or sale of certain machines produced by defendant did not infringe, and dismissing the action. Plaintiff contends that the district court erred in the construction of the patent and in the finding of non-infringement. Defendant denies infringement, and, without filing a cross-appeal, counters that the claims in suit are invalid.

The opinion filed by the district court[3] was very carefully and thoroughly prepared. Although we do not agree with the district court in all particulars, we do agree that plaintiff's action was properly dismissed. We shall avoid unnecessary repetition of the material in the opinion of the district court, and indicate the points at which we agree or disagree.

I. *Validity: Question of Heibel's inventorship with respect to apparatus claims 1 and 4 (318 F.Supp. 940–942).*

There is no question but that Mr. Heibel himself had the idea of "applying a twisting force to the leads in the direction to increase the gripping force of the pairs of free ends of the leads on the intervening discs." This element, with only slight variation, appears in each of the method claims in suit. The apparatus claims referred to a "clamping means imparting" such twist. Fig. 12 in the specifications (shown at 318 F.Supp. 938) depicted saw toothed clamps each pair of opposing "teeth" of which would impart to the arms of a lead a twist with respect to the position in which the arms were held by another clamp. As appears in the testimony quoted in the opinion. Mr. Heibel did not "personally design that saw tooth." We agree with the district court that the saw tooth was an obvious type of clamping means for imparting the twist Mr. Heibel had in mind, that his

predecessor of plaintiff, on the application of Jerome D. Heibel, assignor, November 4, 1953.

3. Erie Technological Prod. Inc. v. Die Craft Metal Prod. Inc., 318 F.Supp. 933 (N.D.Ill., 1970).

leaving the design of the saw tooth to another was immaterial, and that these apparatus claims did not fail on the theory that "he did not himself invent the subject matter sought to be patented." [4]

II. *Validity: Anticipation at Radio Ceramics* (318 F.Supp. 942).

The district court found that certain testimony summarized in the opinion did not sufficiently establish that the process of manufacture of capacitors at Radio Ceramics included "Applying a twisting force to the leads in the direction to increase the gripping force of the pairs of free ends of the leads on the intervening discs." Since two of the witnesses, Frazier and Wilbur, described a reverse twisting or bending process in order to create a tension or gripping force in the leads before insertion of the disc, the finding is not clearly erroneous. We think, however, that this testimony concerning a tensioning process bears upon the conclusion with respect to obviousness.

III. *Validity: Obviousness* (318 F. Supp. 943–951).

1. *The Scope and Content of the Prior Art.* Scope and content are adequately set forth under this heading and also as admissions of the plaintiff under the next heading (318 F.Supp. 943–947).

2. *The Differences Between the Prior Art and The Claims in Issue.* (318 F. Supp. 947–950). We do have areas of disagreement with the district court under this heading. At page 948, the district court concluded that application of the twisting force is within the claims in suit only when it occurs between the clamping means intermediate the hairpin lead and the U shaped bridge end of the lead, and not when it occurs between the intermediate clamp and the free ends of the lead. We finding nothing in the language of the claims in suit (all set forth, 318 F.Supp. 939, 940) which either states or implies such limitation. The specifications clearly indicate the contrary, since they recite as follows: "The clamping members [imparting the twist]

could be located on the side of the [intermediate] clamping members . . . nearest the condensers in which case the twisting force would be applied in the opposite direction, i. e., the arm 4 would be depressed and the arm 5 would be lifted, thereby depressing the free end 6 into tighter engagement with the electrode 2 and lifting the free end 7 into tighter engagement with the electrode 3."

In view of the clear language just referred to, the fact that a torque is produced in each arm of the lead when the twisting force is applied between the intermediate clamp and the bridge end of the lead, but not when the twisting force is applied between the intermediate clamp and the free ends of the lead does not support the limitation found by the district court. We think the court erroneously reasoned that what Heibel described as a twisting force could be one only when it produced as one resultant a torque in each arm of the lead, notwithstanding Heibel's clear statement in the specifications that he meant it to include a force which depressed one arm and lifted the other when applied between intermediate clamp and the free ends.

The episodes in the history of the prosecution of the Heibel and Riley patents, described by the district court, are not, in our opinion, significant with respect to interpreting the claims so as to be subject to this limitation. Cancellation of original claim 5, quoted on page 948, did not estop plaintiff from asserting its claims free of this particular limitation (with respect to the portion of the lead at which the twisting force is to be applied).

The limitation just referred to must also be deleted from the list of "key differences" between the prior art and the claims in issue, given by the district court at 318 F.Supp. 950. In our opinion, the significant difference is the twisting of the hairpin lead, while its intermediate portion is held in position by the carrier strips or other clamping means, in such

4. 35 U.S.C. § 102(f).

**8**

direction as increases the gripping force between the free ends of the lead.

Some forms of bending or twisting in order to produce a gripping force on the disc when inserted between the free ends of the lead were known in the prior art, *i. e.,* the bend or arch as in Ehrhardt, p. 943, 4, lead wires being sprung as in Herrick, p. 944, and the twisting done at Radio Ceramics. Had the judge accepted the testimony of Buckley and Erbe, the twist they described was virtually an anticipation, although applied very near the free ends of the lead. But accepting the testimony of employees Frazier and Wilbur, they were producing a gripping force by a kindred, though not identical, process. The Kraft patent, p. 945, 6, described similar twisting for a similar purpose, though in a different device and with a different material. The closing of a clamp on the intermediate portion of the lead after insertion of the disc between the two free ends itself produces a slight twist, increasing the gripping force exerted on the disc by the free ends of the lead.

■ We do agree with the district court that the process particularly described in the portion of original claim 5, italicized in the district court opinion, page 948 (and described in the specifications and illustrated in Fig. 6, p. 936) is not protected by the claims in suit. Cancellation of original claim 5 estopped plaintiff from claiming that this process is the equivalent of any method described in the claims in suit. The process, however, involves bending the arms of the lead before the intermediate clamp is closed, and the increase in gripping power between the free ends of the lead occurs when the clamp is closed. We see no relevancy to the operation of defendant's machines.

3. *The Level of Ordinary Skill in the Pertinent Art.* The search in this branch of inquiry under 35 U.S.C. § 103 is for a hypothetical "person having ordinary skill in the art to which said subject matter pertains." Where a number of people are joined in commercial organizations devoted to commercial production of an item, for example the capacitors with which we are concerned here, there is usually specialization of effort, often at more than one level. Skill which is ordinary for a production worker is different from that of a manager of a small enterprise who designs methods as well as directs production and conducts business affairs. The ordinary skill of a technically trained specialist whose whole job is to design methods or products is again different. The purpose of this standard in the statute is doubtless to aid in discriminating between substantial innovations and routine improvements, almost inevitably resulting from ordinary competitive efforts. In determining the level of ordinary skill in a particular case, it is appropriate to ask first whether there is any substantial body of people who devote regular and substantial effort to solving the type of problem the alleged invention solves and, if so, to determine the level of ordinary skill of the people in that group.[5]

The district court did not define the level of ordinary skill in the production of ceramic disc capacitors in August to October, 1952, the time the invention was made. Counsel did not direct particular effort at this inquiry. The record shows that disc capacitors were a relatively new product, manufacture having begun in the middle or late 1940's. Radio Ceramics was a small enterprise, manufacturing them for a period beginning in 1949. The principal figures were Mr. Buckley, an

5. *E. g.,* Applications of Grout, 377 F.2d 1019, 1022, (C.C.P.A., 1967): problem solver, not the user of the solution; Gass v. Montgomery Ward & Co., 387 F.2d 129, 132 (7th Cir., 1967): "The level of ordinary skill in the field appears to be that of mechanically inclined men with long experience in design of auto accessories.";

Howe v. General Motors Corporation, 401 F.2d 73, 78 (7th Cir., 1968), cert. den. 394 U.S. 919, 89 S.Ct. 1192, 22 L.Ed.2d 452: "[T]he level of ordinary skill in the field of designing automobile bodies, including hinges, was that of engineers of substantial training, and specialized skill."

electrical engineer, and Mr. Erbe, a mechanical engineer.

Plaintiff has been in business for many years, and was manufacturing disc capacitors in 1952 and later. Mr. Heibel is an electrical engineer, was first employed by plaintiff as a development engineer in 1936, and was chief engineer in 1952. Mr. Coda is an electrical engineer, first employed by plaintiff in 1942 and was on the engineering staff in 1952. Mr. Christenson is a mechanical engineer. He was employed by plaintiff in 1950 and put in charge of drafting design for products. The engineering staff was large enough so that Christenson reported to a Mr. Stone who was intermediate between him and Heibel. Christenson, Stone, and another were named by plaintiff as possibly being the ones who were responsible for developing the equipment after Mr. Heibel gave the directions in 1952.

Sprague of Wisconsin and its predecessors have produced hairpin leads and assembled disc capacitors since 1952. Mr. Rubinstein, president of Sprague, one of the founders of its predecessor in 1946, is an electrical engineer. In July 1952 he designed a hairpin lead for production by Sprague.

It is our best judgment, from the record, that there were a number of people in several commercial organizations who devoted their efforts to solving the type of problem with which this patent deals. Such persons had bachelor's degrees in electrical or mechanical engineering, and practical experience of several years. The level of ordinary skill in the pertinent art at the time the invention was made reflects such technical training and experience.

■ 4. *Whether the Subject Matter as a Whole would then have been Obvious to the Person Having Ordinary Skill in the Art.* Of course the patent office must have decided that the subject matter would not have been obvious, and

issuance of the patent creates a presumption in its favor.[6] We are to be on guard against deciding that the subject matter of any patent would have been obvious solely because it has become obvious by hindsight. Although we should, and do, carefully consider the conclusion reached by the district court, the ultimate issue of obviousness under 35 U.S.C. § 103, after it has been refined by performing the steps required by Graham v. John Deere Co.[7] is one of law.[8]

■ Exercising all caution, required as just stated, the only conclusion which satisfies our minds is that in August to October, 1952, when the person of ordinary skill above referred to was confronted with the problem of the free ends of leads, held in the strips described, having insufficient gripping power to hold disc capacitors in place during soldering, it would have been obvious to apply a twisting force to each lead in such direction as to increase the gripping power of the free ends.

IV. *Infringement.*

If the claims in suit were valid, we would have great difficulty agreeing with the district court that defendant was not guilty of contributory infringement.

Defendant's Wyr-Former produces hairpin leads fastened by tape, side by side, to a card board strip. Defendant's Disc-Loder inserts ceramic discs in the leads on such strips. Defendant's brochure advertises the two machines "for fast, economical capacitor manufacturing." With respect to the Wyr-Former, the brochure announces that "any shape of capacitor leads can be made uniformly at a rate of 100 per min. Leads are automatically formed, taped to a $\frac{1}{16}''$ x $\frac{3}{4}''$ x $22\frac{1}{2}''$ chipboard and pretensioned, ready for disc insertion." With respect to the Disc-Loder, it says: "Ceramic discs are positioned by vacuum and inserted into entire chipboard of leads in $2\frac{1}{2}$ seconds."

---

6. 35 U.S.C. § 282.

7. 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

8. Technograph Printed Circuits v. Methode Electrical, Inc., 356 F.2d 442, 447 (7th Cir., 1966).

Leads may be produced on the Wyr-Former without tension in the arms of the lead, but if tension is desired, a part known as the wire tensioner is used. The operating manual describes the function of the tensioner as follows:

"At the right end and mounted on the front of the chain track is the wire tensioner. Its purpose is to put a slight bend in right lead and left lead which will put additional tension between the wires for the purpose of holding an inserted ceramic tight enough to prevent the ceramic from losing its position before it has been soldered."

If the lead were horizontal and viewed from the side, the arm of the lead the end of which crossed over the other free end would be bent downward and the other arm upward. The bends are between the portion of the lead held by the tape and chipboard and the free ends. As correctly stated in plaintiff's brief, "While engaged by the tensioner, an increased grip is developed which remains after the leads leave the tensioner because the leads have been stressed beyond their elastic limit so that the leads have a built in stress which continues to provide the increased grip."

The district court found two differences, considered significant, between the operation performed by the Wyr-Former and the claims in suit.

The first was that the bending force is applied near the free ends of the lead and not near the U shaped bridge end. As already pointed out, the claims are not limited to application of the twisting force near the bridge end of the lead.

The second difference was that defendant's tensioners "bend rather than twist the hairpin leads." In our view, bending of the arms of the hairpin lead necessarily results from the application of the twisting force referred to in the claims. The fact that the force applied by defendant's tensioner is sufficient to accomplish permanent deformation of each arm of the lead is a difference in degree and not in kind.

The patentee's "Language will be given the meaning intended if it can be ascertained from the context." [9] "Claims are to be construed in the light of the specifications." [10] It seems clear from the specifications here that (assuming that the lead is horizontal) Heibel meant by "applying a twisting force" forcing one arm downward and the other upward, both being held in the same place by the intermediate clamp. The specification explains that when the twisting force is applied near the bridge end of the lead, the arm the free end of which is above the disc is to be lifted and the other arm depressed. The intermediate clamp acts as a fulcrum and the free end of the former is thereby depressed and the free end of the latter raised. As already stated, the specifications also explain that when the twisting force is applied near the free ends of the lead, the arm the free end of which is above the disc is to be depressed and the other arm lifted. Defendant's tensioner does exactly that (except that the discs have not yet been inserted).

The method claims, 3, 5, and 6, contemplate that the discs are to be inserted between the free ends before the arms of the lead are fastened or clamped to a strip and before the twisting force is applied. Defendant's Disc-Loder inserts the discs after the tensioner on defendant's Wyr-Former has increased the gripping force between the free ends. If this difference be significant and negative infringement of the method claims, such difference does not appear in the apparatus claims 1 and 4.

V. *Our Jurisdiction to Review the Issue of Validity on this Appeal.*

The judgment in the district court determined that the claims in suit were

9. Deller's Walker on Patents, 2d ed. § 228 at p. 76; Dennis v. Pitner, 106 F.2d 142, 148 (7th Cir., 1939), cert. den. 308 U.S. 606, 60 S.Ct. 143, 84 L.Ed. 507.

10. Minnesota Mining and Mfg. Co. v. Technical Tape Corp., 309 F.2d 55, 58 (7th Cir., 1962).

valid but not infringed and dismissed the action. Plaintiff appealed. Defendant did not appeal, but has argued here that the determination of validity was erroneous.

 Either our approval of the district court's determination of no infringement or our determination that the claims are invalid, contrary to the conclusion of the district court would result in affirmance of the dismissal of the action. We have decided that the decision of non-infringement is erroneous, and could therefore properly consider the validity issue, since a decision of invalidity would also result in affirmance of dismissal.

But even without considering whether the decision of no infringement is correct, we would be free to, and perhaps even obliged to, consider the validity issue because of the public importance thereof.[11]

The judgment appealed from is modified so as to declare that the claims in suit are invalid, and, as so modified, is affirmed.

PELL, Circuit Judge (dissenting).

I find myself unable to be in complete agreement either with the district court or the majority of this court's panel despite the thorough ventilation of the facts and law contained in their respective opinions. I therefore dissent.

On the matter of validity, the result reached by Judge Marovitz (318 F.Supp. 940 et seq.) strikes me, as I trace the analytical pathway he pursued, as being eminently correct. I would approve and adopt that part of the district court's opinion.

However, the majority opinion of this court seems to me to refocillate the appellant's infringement claim and to ar-

rive properly at a repudiation of the district court's finding of non-infringement.

I therefore would reverse and remand the case for an accounting.

---

11. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945) ; Maytag Company v. Murray Corporation of America, 318 F.2d 79, 80 (6th Cir., 1963) ; Mannix Company v. Healey, 341 F.2d 1009, 1013 (5th Cir., 1965). See, also, Pambello v.

Hamilton Cosco, Inc., 377 F.2d 445, 447 (7th Cir., 1967), M.O.S. Corporation v. John I. Haas Co., 375 F.2d 614, 617 (9th Cir., 1967), Powder Power Tool Corp. v. Powder Actuated Tool Co., 230 F.2d 409, 415 (7th Cir., 1956).