ERIE TECHNOLOGICAL PRODUCTS, INC., a corporation, Plaintiff,

v.

DIE CRAFT METAL PRODUCTS, INC., a corporation, Defendant.

No. 67 C 186.

United States District Court, N. D. Illinois, Eastern Division.

April 30, 1970.

John W. Hough and John T. Allen, Jr., of Price, Cushman, Keck & Mahin, Chicago, Ill., James I. Bliss, Rolling Meadows, Ill.; George Bullwinkle, of Wolfe, Hubbard, Voit & Osann, Chicago, Ill.; and Ralph Hammar, Erie, Pa., for plaintiff.

Keith J. Kulie and Donald B. Southard, of Kulie & Southard, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

### Findings of Fact and Conclusions of Law

This matter having duly come for trial before this Court on November 3–6, 10 and February 10, 1970, at Chicago, Illinois, and the Court having considered the evidence, and being duly advised in the premises, hereby renders its decision in the form of an opinion containing findings of fact and conclusions of law.

### INTRODUCTION

This is an action under the Patent Laws of the United States, Title 35 U.S. Code, involving United States Letters Patent No. 2,766,510 entitled "Method and Apparatus for Making Condensers." The patent issued to Jerome D. Heibel on October 16, 1956, based on application Serial No. 390,115 filed November 4, 1953.

Plaintiff, Erie Technological Products, Inc., is a corporation organized under the laws of the state of Pennsylvania, and is the sole owner of the Heibel patent here in suit. It is the same corporation as Erie Resistor Corporation, assignee of the Heibel patent when granted. Defendant is a corporation organized under the laws of the state of Illinois with its principal place of business in Des Plaines, within the Northern District of Illinois, Eastern Division. This Court has jurisdiction of the parties and subject matter, and venue is properly laid in this district. 28 U.S.C. §§ 1338(a), 1400(b).

This action was initiated by the filing of the original complaint on February 3, 1967 charging Defendant with infringement of Claims 3, 5 and 6 of the Heibel patent, said claims relating to a method for making capacitors. Subsequently, an amended complaint was filed by Plaintiff in May, 1969 charging Defendant with infringement of apparatus Claims 1 and 4 of the Heibel patent. In its answer to

the original and amended complaints Defendant denied infringement, and asserted invalidity of the pertinent patent claims under 35 U.S.C. §§ 102(b) and 103.

Both the validity and infringement of the patent are in issue, with Plaintiff charging both contributory infringement and inducing infringement under 35 U.S.C. § 271. Defendant's position is that Heibel did not invent the apparatus, and that the apparatus claims are therefore invalid. Defendant also urges that the method had been in public use or on sale more than one year prior to the filing date of the application which matured into the patent in suit, thus rendering the method claims of the patent invalid under 35 U.S.C. § 102(b). In addition, Defendant relies on certain prior art to show that Claims 1 and 3–6 are invalid as "obvious" under 35 U.S.C. § 103. With respect to infringement, Defendant's position is that it is not guilty of contributory infringement or inducement to infringe since there is no direct infringement. Defendant also presents issues of file wrapper estoppel and equitable estoppel with respect to the infringement question. There are no antitrust, misuse or fraud issues before the Court relating to the patent or the business dealings of the parties.

The trial of this case began on November 3, 1969 and continued through November 6. Thereafter, the trial was reconvened for a day on November 10. Depositions of former employees of Radio Ceramics Corp. were also taken on November 22, 1969 by agreement of the parties and entered in the record (Buckley, Erbe, Frazier and Wilber). Thereafter a final day of trial was held on February 10, 1970. The transcript of trial is over 750 pages, while the pre-trial and pending trial deposition transcripts run some 117 additional pages. Several hundred documents and physical exhibits were introduced, with many of the documentary exhibits consisting of numerous pages or parts. Both Plaintiff and Defendant entered into evdence answers to interrogatories of the opposing party. Buckley also testified at the trial. The deposition of Harry W. Rubinstein of the Sprague Company in Wisconsin was offered on November 4, 1969. The deposition of the inventor, Jerome D. Heibel, was read into the record on November 10. Post-trial briefs and proposed Findings and Conclusions were filed by both parties. Statements made therein are taken as the final positions of the individual parties.

Some of the oral testimony and publications concerned technical matters, and in some instances the oral testimony shed light on, or conflicted with, the position of the parties, statements of the witnesses, depositions and published documents. The following Opinion is a result of the Court's careful consideration and weighing of the most credible evidence, both testimonial and documentary, and evaluation of visual courtroom demonstrations and demonstrative physical exhibits prepared for the trial. The statements contained in this Opinion are also predicated upon the Court's observations, its own questioning of the witnesses, and a consideration of their demeanor, competency and credibility. Many of the statements contained herein are adopted in whole or in part from Findings and Conclusions which were proposed by the parties.

Any statement herein may be considered in whole or in part as a Finding of Fact or Conclusion of Law, and shall be so deemed and treated as if set forth under separate headings for Findings of Fact and Conclusions of Law herein. The Opinion below is not meant to be regarded as an exhaustive catalog of all the facts and testimony; rather it is an exemplary selection of all the facts and points of law considered in arriving at this Court's decision as presented in summary form.

For reasons set forth below, this Court determines that Claims 1 and 3–6 are

valid, but not infringed, the decisive issue being the proper scope of the claims in suit. Further, since Claim 2 is not in issue, the Court makes no determination with respect to its validity or infringement.

## OPINION

■ Our starting point is the Constitutional mandate giving Congress the power "to promote the Progress of * * * useful Arts", Article I, § 8, clause 8. This requirement calls, as a first step, for a review of the patent in suit. In this analysis, however, the Court is aware that it must guard both against slipping into hindsight, Graham v. John Deere, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and against the appealing temptation to equate obviousness with simplicity, Palmer v. U. S., 155 USPQ 524, 528 (Commr., U.S.Ct.Cls. 1967), aff'd per curiam 182 Ct.Cl. 896 (1968).

The Heibel patent discloses, in part, both method and apparatus for the manufacture of capacitors (condensers) comprising ceramic disc dielectric elements having conductive leads soldered to opposing sides of the disc. The soldered condenser is enclosed in an insulating case formed by dipping in plastic. The patent also discloses an ultimate convenience package for shipping the finished capacitors mounted on notched cardboard strips in a container. This latter, however, is not part of the Heibel invention, being that of one of his co-workers, Mr. Lewis J. Shioleno, and which is covered by U.S. Patent 2,757,792, not in suit here (Heibel deposition.)[1]

Briefly, and with reference to the patent drawings reproduced below, Heibel uses conventional U-shaped hairpin leads having straight-sided arms connected at one end by an arch (Fig. 3). The free ends of the leads are formed to a crossover or X-shape. The hairpin leads have some resemblance to a paper clip, and in an undistorted state, will lie substantially flat on a plane surface. A round ceram-

ic disc 1 having electrodes 2 and 3 on opposite faces is inserted between the X-shaped free ends of the leads (Fig. 1), and clamped between two strips, such as cardboard 10, 11 (Figs. 6, 8 and 9). The assembly of clamped leads each holding a ceramic capacitor element (Fig. 5) is then dipped in solder to secure the offset free ends 6 and 7 to the electrodes 2 and 3. The soldered capacitor is then dipped in plastic to form a water-resistant, electrically insulating case 8 (Figs. 1 and 2). Thereafter, the U-shaped bridges 9 (Figs. 3 and 5) are cut off leaving the soft wire leads 4 and 5 free for making connections in preparation of electronic circuits (Fig. 4). (Heibel patent Cols. 1 and 2.)

From the testimony and background prior art information, it is clear that capacitors had long been made by hand, and commonly involved the steps of forming a capacitor disc and inserting it between two wire leads. Initially, the wire leads were hand soldered at their point of tip contact with the capacitor electrode material. Later, but prior to the time the Heibel invention was made, the soldering steps evolved into a dip soldering technique. By this conventional process, the capacitor, held by the leads, was dipped

---

1. The drawings in the Shioleno patent are materially identical to Figs. 1, 2, 9, 16, 18, 19 and 20 of the Heibel patent in suit.

into a solder bath. Also, the capacitor was conventionally coated with some type of protective coating such as wax or a plastic resin. Rather than use two separate soft wire leads, it had also been conventional prior to Heibel to employ hairpin leads, a single piece of wire bent in the form of a U, with the ceramic capacitor disc being placed between the two free ends of the leads. To accomplish the soldering, the capacitor assembly was held by hand or was hung by hooks engaging the bridge portion of the U-shaped leads, and dipped into the solder bath.

As demand increased, the need for an increased rate of production was felt by manufacturers. There then evolved methods of holding a plurality of these condensers by their leads, for example, by means of a pair of clamping bars which engaged the U-shaped hairpin leads at their mid-sections. By such method, a plurality of the condensers could be dip soldered simultaneously.

With respect to purpose and problem solved, the Heibel patent points out that one of the problems of the prior art methods of manufacture was that the parallel soft wire leads would "tend to tangle if the condensers are packed in bulk * * *" (Heibel, Col. 1, lines 13–14). The patent states (Col. 1, lines 8–16):

> This invention is intended to simplify the handling of electrical condensers during manufacture, shipping, and movement up to the point of use. Such condensers commonly comprise an electroded ceramic or other dielectric body with generally parallel soft wire leads which tend to tangle if the condensers are packed in bulk and which are usually cut off to the desired length, straightened and formed at the point of use.

While it is clear that the notched cardboard strips which secure the finished Heibel capacitors obviate the bulk pack

tangling problem, that solution to the problem is more relevant to the Shioleno patent than the Heibel patent in suit.

Heibel's second purpose was to prevent the dielectric discs from dropping out from between the leads during manufacture. This is evident in the patent from the frequent reference to, and overall concern with, gripping of the discs by the X-ends of the hairpin leads.

With ordinary, plain, undistorted hairpin leads of the prior art, the cross-over or X-ends between which the ceramic discs are inserted developed enough gripping power to hold perhaps 90% of the discs. However, 90% of the discs held means 10% are lost, which is easily appreciated to be a significant loss in terms of the desired production quantities. The Heibel patent is directed to the solution of eliminating this loss percentage by increasing the gripping power of the X-ends through the use of imparting a twist to the leads by appropriate means.

Heibel testified that he made his invention while seated at his desk.[2] In his words (Deposition, page 46; Nov. 10, Tr. pp. 287–288):

> I recall sitting at my desk and worrying about several things; one was the fact that in our manufacture of these discs with ordinary clamps we had trouble with discs falling out. Another was at that time the automation of insertion of discs by our customers was a very important subject. And there was great pressure put on us to hold tolerances on the spacing of leads that we considered unreasonable. But still we had to make every effort to satisfy our customers on it. And one of the reasons it was difficult was that no matter how accurately we spaced the leads to begin with, they would get bumped and changed in shipment. So, as a mental exercise or just as a method of adjusting myself to the problem, I sat down one day and tried to figure out what could be

2. The validity of the patent shall not be negatived by the manner in which it was made, 35 U.S.C. §§ 103, 282; the manner in which it was made is pertinent, in this case, to help ascertain what Heibel regarded as his invention, 35 U.S.C. § 112.

done about it. My initial thought was to try to mount the leads, put them in exact position before the unit was ever manufactured, and then keep them that way until the customer actually used the product in his own plant. So it was with this thought that led to the idea of the stapled cardboard holders. Then I made a model of this for myself with the disc equipment, cardboard, and I had some of the hairpin leads.

And I found that when I assembled them this way, the discs were very lightly held. And I discovered through thought, or whatever my mental process was, that by twisting the bridge end of this lead, I could very substantially increase the pressure holding the disc in place.

This is stated in the patent generally as one embodiment of the invention as follows (Column 1, lines 17–25):

> One feature is the twisting of hairpin leads so as to increase the grip of the free ends of the leads on an intervening electroded body. In one form, there is a clamping member at an intermediate portion of the leads with the dielectric body on one side of the clamping member between the free ends of the leads. A twist applied to the leads on the other side of the clamping member materially increases the grip on the dielectric body which is desirable prior to soldering.

Thus, a straight piece of wire may be bent in the form of a U, the free ends are crossed over to form the X-ends of the leads for contacting the ceramic dielectric body. This hairpin is then placed between two cardboard strips which may be stapled together, the X-ends of the leads are then separated sufficiently to slip the ceramic dielectric body therebetween and the U-shaped end of the hairpin lead projecting from the other side of the paper strip is given a twist to increase the gripping force of the X-ends of the leads on the ceramic so that the ceramic will not fall from between the X-ends while being dipped in the solder. After being dipped in the solder,

the dielectric is securely fastened for any further processing.

Viewed from the U-end of the hairpin lead, when the right hand lead crosses over the top of the left hand lead at the X, a counterclockwise twist is given to the U-end of the hairpin lead in order to increase the grip of the X-end on the ceramic disc. This is illustrated in the Heibel patent in Figures 11 and 12. The use of the cardboard strips 10, 11 is broadly described in the patent as a first clamping means, while imparting the twist to the bridge end of the lead is said to be done by second clamping means, for example "saw toothed" clamps 14, 15:

FIG. 11 FIG 12 FIG 13

In an alternate form of the first clamp (Fig. 13 above), which represents the developmental stage before the use of the cardboard strips alone, those strips are replaced by rubber coated metal bars 18, 19. The rubber provides a resilient gripping surface 20 and permits the transfer of the twisting force near the U-end to the free X-ends.

A second embodiment of the Heibel invention involves what is termed "initial reverse twist", or a "pre-twist", the terms "initial" and "pre-" referring to prior to clamping by the first clamping means, i.e. the cardboard or rubber-covered metal bars. In this embodiment, recalling that the conventional hairpin lead lies generally in a plane defined by U-shaped bridge 9 and arms 4 and 5 (Fig. 3), the arms 4 and 5 are twisted apart out of that plane to provide the configuration of Fig. 6. Thereafter, the first clamp members 10 and 11, when secured together, alone provide the improved grip on the dielectric disc; the second set of clamping members are not required. This is set forth in the patent as follows (Col. 1, lines 24–31):

> * * * In a preferred form, the clamping member comprises a pair of elongated cards which are stapled together to clamp the individual hair-

pin leads between the cards. If the hairpin leads have an initial reverse twist, the clamping of the cards together will overcome the reverse twist and impart the desirable gripping force on the intervening dielectric body.

Concerning the method of producing the twist and gripping force, the patent states, inter alia (Col. 2, lines 24–44):

For convenience in manufacture, the leads 4 and 5 are usually made in the form of a hairpin as shown in Fig. 3 with the free ends of the hairpin having the angular offsets 6 and 7 and the other ends being connected by an arch 9. While there may appear to be some resemblance between the hairpin lead construction shown in Fig. 3 and a paper-clip, the fact that the leads 4 and 5 must be of soft wire so as to be easily bent in making connections and the length of the leads 4 and 5 makes this construction have very little of the gripping characteristics of a paper-clip. It has been found, however, that if the leads 4 and 5 can be twisted relative to the free ends 6 and 7 sufficient gripping force between the ends 6 and 7 can be developed so that a capacitor can be gripped between the ends 6 and 7 so as to permit dip-soldering to the electrodes 2 and 3. Figs. 6 to 13, inclusive, show various arrangements for producing the twisting action which provides the necessary additional gripping force between the ends 6 and 7 so that a condenser can be supported therebetween until the permanent connection is made by dip-soldering.

At this juncture, it is well to point out that the parties have had continuing and substantial disagreement over the terms "bend" and "twist" as used in the patent in suit and the prior art. While the reason for the controversy is evident— the equivalence of the terms or effect is an element in establishing infringement —the net result of the controversy is to confuse the issue rather than simplify it. Defendant's position, in summary, is that it *bends* its leads on the side of the clamping strips adjacent the dielectric disc, and

that this bend is different from a *twisting* of the U-shaped end of the hairpin bridging the leads, or the leads themselves on the side of the strip *remote* from the capacitor. In contrast, Plaintiff's position, except where confronted by the prior art and prior public use, is that "twist" as used in the Heibel patent (Col. 2, lines 35–38 and Col. 3, lines 64–71) refers to the overall effect on the hairpin lead and not to what is done to individual arms of the lead, and the combined effect of "bending" lead pairs is to produce a "twist" (Coda, November 5, Tr. 385, 388–392, 404). In short, Plaintiff views Defendant's bending as falling within the patent's meaning of "twist", noting that the patentee can define his own terms.

With this in mind, the Heibel claims in issue read as follows (paragraphing and numbering by the Court):

*Method Claims*

*Claim 3*

The method of making condensers from dielectric discs having electrodes on opposite faces, which comprises

1) arranging spaced hairpin leads crosswise between strips

> with pairs of free ends of the leads offset toward each other in overlapping relation and spaced apart along one edge of the strips and

> the connecting arches of each lead spaced apart along the other edge of the strip,

2) inserting discs between each pair of free ends of the leads with the electrodes in contact therewith and

3) fastening the strips together to fasten and clamp the leads therebetween,

4) applying a twisting force to the leads in the direction to increase the gripping force of the pairs of free ends of the leads on the intervening discs and

5) using the strips as a carrier dipping the discs in solder to solder the electrodes to the free ends of the leads.

*Claim 5*

The method of making condensers from dielectric discs having electrodes on opposite faces, which comprises

1) forming wire into hairpin leads with free ends offset toward each other end and in overlapping relation,

2) inserting individual discs between the free ends of individual leads and

3) fastening and clamping the individual leads to a strip with the discs spaced along one edge of the strip and the arched ends of the hairpin leads spaced along the opposite edge of the strip,

4) applying a twisting force to the leads in the direction to increase the gripping force of the pairs of free ends of the leads on the intervening discs, and

5) using the strip as a carrier dipping the discs in solder to solder the electrodes to the free ends of the leads.

*Claim 6*

The method of making condensers from dielectric discs having electrodes on opposite faces, which comprises

1) arranging spaced leads crosswise of a clamping strip

with pairs of free ends of the leads offset toward each other in overlapping relation and spaced apart along one edge of the strip,

2) inserting discs between each pair of free ends of the leads with the electrodes in contact therewith and

3) clamping the leads against the strip

4) applying a twisting force to the leads relative to the strip in the direction to increase the gripping force of the pairs of free ends of the leads on the intervening discs, and

5) using the strip as a carrier dipping the discs in solder to solder the electrodes to the free ends of the leads.

*Apparatus Claims*

*Claim 1*

Apparatus for the manufacture of disc shaped devices having electrodes on opposite faces to be connected to leads comprising

1) clamping means for clamping the intermediate portion of arms of hairpin leads

having free ends offset toward each other in overlapping relation

along one edge of the clamping means and adapted to receive a disc therebetween, and

2) another clamping means imparting a twist to the arms relative to the first clamping means

in the direction to increase the gripping force between the free ends of the leads.

*Claim 4*

The combination of Claim 1 in which the first clamping means comprises

1') a pair of flexible strips fastened together with the hairpin lead extending crosswise of the strip and projecting beyond each edge thereof.

## VALIDITY

*A. Anticipation Under 35 U.S.C. § 102*

Although the principal validity issues are concerned with 35 U.S.C. § 103 "obviousness," Defendant raises two threshold issues under 35 U.S.C. § 102. The first of these arises with respect to the apparatus Claims 1 and 4. The question is whether or not Heibel was the inventor of the appartus set forth in the patent in suit. This issue arises under 35 U.S.C. § 102(f), which states in pertinent part:

§ 102. Conditions for patentability; novelty and loss of right to patent.

A person shall be entitled to a patent unless

\* \* \* \* \* \*

(f) he did not himself invent the subject matter sought to be patented

\* \* \*.

■ The burden of proving the non-inventorship by the patentee Heibel is on Defendant, and its proofs amounted principally to statements out of Heibel's own mouth (Tr. 286–287, Question by Mr. Kulie for Defendant, Answer by Heibel):

[Q] I will ask you this: Did you personally design the apparatus as you have depicted in Defendant Exhibit A–1 at Figures 12 or 14?

[A] My direct contribution on this was the idea of applying a twist to the lead whether by putting in as an initial twist or by doing it by turning to loop portion of the lead after it was in the rack. I didn't personally design that saw tooth. What I did was point out that if you take the lead and the loop end of the lead on the loop side of the rack and turn it, that this twisting action was developed. I demonstrated this to the people responsible for the development of the equipment. And it was obvious that a saw tooth of that type would do the same thing that I did. But who made the drawings and decided how much angle should be put on, and so on, I don't recall. I am sure I did not.

In Defendant's view, this amounts to an admission that he did not invent the apparatus, was not involved in working on it, and merely turned it over to the people who were responsible for the machine development. Defendant also points to the testimony of Nello Coda, Chief Engineer of Plaintiff, as indicating that neither he nor Mr. Hammar, Counsel for Plaintiff, could locate any documents relating to instructions given to anyone relating to an apparatus for making disc capacitors (Tr. 312 ff).

In this regard, Plaintiff introduced much evidence concerning a machine built by Swanson Machine Co. who built a capacitor manufacturing machine for Plaintiff. However, the evidence is clear that the Swanson machine was initially delivered without the claimed twisting means, and such means was not added until late 1954, after the application was filed.

Defendant does not directly deny that Heibel had the idea of the twist. Indeed, Defendant urges that the only thing Heibel was involved in was the concept of applying the twist to the arched or U-shaped loop portion of the lead.

■ The legal test for a suggested idea to be accorded the dignity of "invention" is that it must relate the specific means to accomplish the desired result in such detail as to enable one of ordinary skill to embody the same in practical form. The test is from Agawam Woolen Co. v. Jordan, 74 U.S. (7 Wall.) 583, 19 L.Ed. 177 (1868), wherein the Supreme Court stated (19 L.Ed. at 182):

Suggestions from another \* \* \* must have furnished such information to the person to whom the communication was made that it would have enabled an ordinary mechanic, without the exercise of any ingenuity and special skill on his part, to construct and put the improvement in successful operation.

That test is a practical one and reflects the Constitutional mandate to promote the progress of the useful arts. Accord, 35 U.S.C. §§ 102(a), 112. In short, an enabling disclosure is required.

■ The evidence of record demonstrates that Defendant's contention is not convincing. The veracity of Heibel's testimony about his making a model employing cardboard strips has not been challenged by Defendant, and the Court finds it credible. Of course, the cardboard strips are the first recited means of the apparatus claims, and his hands, providing the manual twist, the second means.

It is also clear that the claimed apparatus is simplicity itself in its breadth. In view of the evidence in the record of the level of ordinary skill in this art at the time the invention was made, it is clear that the communication by Heibel of the twist idea would have enabled the ordinary mechanic without the exercise of ingenuity or special skill on

his part to construct and put the claimed apparatus improvement into successful operation. Once told the idea, as Heibel himself said, it was obvious to construct. Indeed, Defendant's other argument that the apparatus is obvious is inconsistent with its argument of non-inventorship.

The second "threshold" § 102 issue centers around the testimony and other evidence relating to work at Radio Ceramics Corp. of Angola, Indiana in 1950–1952, which is more than one year prior to Heibel's application.

Radio Ceramics was started around August, 1948 as a partnership of Charles H. Buckley, A. Roscoe Erbe, and others who rented a barn in which to produce ceramic capacitors. At least both these men had relevant prior experience in the field, Buckley being an electrical engineer and Erbe a mechanical engineer, both graduates of Tri-State College in Angola. Their business reached its peak in 1950 and remained at about the same level until 1953 (November 6th Tr. 7, 17).

According to Buckley, leads were made by winding the wire in a spiral on a mandrel of generally rectangular cross section with longitudinal grooves on the narrow edges. After winding, the mandrel was placed in a press and a knife blade cut and forced the wire into one of the grooves while a form fixture indented the wire into the other groove. This resulted in a plurality of individual leads, one lead for each turn of the spiral (Nov. 6th Tr. 19–21). After removing from the mandrel, the cut ends of the individual leads sprang together in overlapping relation (Buckley Deposition pages 13, 20) and were ready for use in capacitor manufacture (Exhibit 196). While the free ends of the leads overlapped, they were J-shaped rather than X-shaped.

Buckley also testified that the insertion of the capacitor disc was always by hand. The uncut end of a lead was grasped between the thumb and forefinger of one hand, a disc was inserted between the cut ends of the lead, the cut ends of the lead were grasped between the thumb and forefinger of the other hand, and the lead was given a twist by rotating the hands relative to each other in a clockwise direction. While still holding the lead by the uncut end, the disc was dipped first in flux, then in solder, and then the soldered assembly was dropped into a solvent (Buckley Nov. 6th Tr. 23–28).

That testimony was substantially repeated by Mr. Erbe. But their description of the twist alleged to be used did not agree in material respects with that described by two of the women who worked there at the time, Celestine Frazier and Marjorie Wilbur. They described the twist as involving bending of the leads away from each other and then reversing their position. Thus it is not shown by clear and convincing evidence that a twist in the direction to increase the gripping force of the pairs of free ends of the leads on the disc was made at Radio Ceramics more than one year prior to Heibel's application.

Even were the evidence adequate, the use of the twist alone does not anticipate the claimed method and apparatus in other respects. Radio Ceramics did not employ clamping means or strips in the manner called for in the claims, and did not use a carrier strip to simultaneously dip solder a plurality of condensers.

Plaintiff properly urges that the claims are to be interpreted in the light of the specification. The specification, at Col. 2, lines 45–47, indicates that the operation of gripping the condenser dielectric between the free ends of the hairpin lead may be done manually. Thus, manual gripping of the disc between the lead ends by the thumb and forefinger testified to by Buckley and Erbe may indeed be the first clamping means called for by the claims, while the "twist" applied by hand may be the second clamping means. But the placement of the Radio Ceramics "first clamp" was not that called for by the Heibel claims. Buckley "clamped" the lead *ends* at the disc, while the claims call for the clamp to be disposed intermediate the free end and the U-shaped bridge loop. Similarly,

clamping said to be done during conveying at Radio Ceramics was at the loop end only.

Finally as to this issue, Defendant urges that Plaintiff has admitted, and the prior art shows, that except for the twist all steps and apparatus are old as to Heibel. This missing step being supplied by Radio Ceramics, Defendant urges, bars the issuance of any valid patent rights under 35 U.S.C. § 102(b). Even were the claimed twist clearly established, however, such combination is properly an issue under 35 U.S.C. § 103, and is accordingly discussed below.

**B. "Obviousness" Under 35 U.S.C. § 103.**

The starting point for an analysis of the obviousness or nonobviousness of the claims in suit is the basic factual inquiries set forth in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):

> While the ultimate question of patent validity is one of law, Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. at 155, 71 S.Ct. at 131, the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. See Note, Subtests of "Nonobviousness," 112 U.Pa. L.Rev. 1169 (1964).

Plaintiff makes no arguments for significant commercial success, long felt but unsolved needs, or failure of others,

and the contribution of the Heibel invention to the art has in part been set forth above.

**1) The Scope and Content of the Prior Art.**

In addition to the prior public use and knowledge in the United States of the Radio Ceramics method and apparatus, the following U. S. and British patents were introduced in evidence as prior art:

| | | |
|---|---|---|
| Fowler | 111,051 | Jan. 17, 1871 |
| Ehrhardt et al | 2,321,071 | June 8, 1943 |
| Herrick | 2,606,955 | Aug. 12, 1952 |
| Marks | 2,619,519 | Nov. 25, 1952 |
| | filed Oct. 31, 1949 | |
| Riley | 3,038,242 | June 12, 1962 |
| | filed March 22, 1954 as a divisional | |
| | of an application filed Aug. 17, 1950 | |
| Kraft (British) | 619,662 | March 11, 1949 |
| | (Received, U. S. Patent Office Library | |
| | July 26, 1949) | |

Fowler, cited during the patent prosecution as a principal reference, shows straight pins secured transversely between a continuous lower strip and an upper, adhesive bearing strip so that the points and heads extend from opposite sides of the strips. The Patent Office relied on this patent for showing the feature of the package and arrangement of the secured item to project beyond the side edges of the strip (File Wrapper, p. 23).

Ehrhardt et al., relied on by the Patent Office as a principal reference, shows simultaneous dip soldering of a plurality of disc-shaped rectifiers having hairpin type leads which are to be soldered to the opposite planar faces of the disc. The patent states (p. 1, Col. 2, lines 45–50), and shows (Fig. 2):

FIG.2

[A2825]

The wires 21 and 22 may be temporarily secured to the disc faces by suitable clamping means. One way to do this is as shown in Fig. 2, i. e., use a U-shaped piece of wire bent at 25 and having arms 21 and 22, which may be clamped on the disc 20. This wire may be cut at 25 after soldering.

The disc assemblies are individually hung from rods by hooks and dipped into a pre-soldering bath, and then into a special flux and solder bath.

The Patent Office relied on this patent to show the feature of and method for simultaneous dip soldering, and a support for a plurality of units (File Wrapper, pp. 29–30). Heibel, during prosecution, pointed out that Ehrhardt et al did not show a pair of clamping bars gripping the leads in the middle. Heibel also argued that Ehrhardt et al would not work with thin flexible wire, alleging that the patent shows "a lead which must have rigidity of a paper clip if it is to be effective" (File Wrapper, p. 34). The patent is silent on this point, but it is evident that rectifier leads are ordinarily bent to be secured to terminals in use. No weight can be given to that interpretation of the Ehrhardt et al patent since Plaintiff did not support it at the trial. The Heibel rigid wire interpretation of Ehrhardt et al is considered merely to be patent prosecution argument, not fact.

It is evident from Fig. 2 that the plane of the hairpin of Ehrhardt et al. is oriented at right angles to the rectifier disc, and resembles, in miniature, a pair of tongs. A clamping action to temporarily secure the loop-shaped free ends onto the disc during dip soldering is imparted by the bend 25. The bend in the lead intermediate the loop-shaped free end and the U-shaped end 25 appears to provide clearance for the mask 24.

Herrick, also relied on by the Patent Office as a principal reference, shows a ceramic condenser having wire leads, and was particularly concerned with vacuum vapor coating of the ceramic with copper and chromium, to which the leads were then soldered. The free ends of the leads were loop-shaped like Ehrhardt et al. The leads are shown in Figure 2 to approach the disc in a converging manner with the ends being adapted by bending to engage flatwise the coating on the ceramic disc. In pertinent part the patent states (Col. 3, lines 16–28):

There is then associated with the disc a pair of lead wires 8 and 10 provided with loops 12 and 14 which are adapted to engage flatwise the copper coatings on the flat surfaces of the disc. *This association may be effected by holding the lead wires 8 and 10 in clamping means so that they are sprung against the copper coatings and support the coated disc.* The disc and the looped ends of the lead wires, which are preferably of tinned copper, are then dipped into a bath of solder and removed with the result that the solder will adhere to the copper coatings and to the wires to bond them together. [Emphasis supplied.]

The Patent Office called attention to the above emphasized teaching in Herrick (File Wrapper, p. 22), and the patentee argued in reply that Herrick "shows no arrangement for twisting the leads so as to increase the clamping pressure on the intervening condenser" (File Wrapper, p. 25).

The ordinary dictionary definition of the verb "to spring" (past participle, "sprung"), is inter alia, "to be resilient", "to bend from a straight direction or plane surface", and "to bend by force." Webster's New International Dictionary, Second Edition Unabridged, G. C. Merriam Co., 1934, p. 2440.

Marks, not cited in the Patent Office prosecution, shows multiple capacitor units, i. e. a sandwich of two ceramic discs spaced apart by a lead and having two ordinary outer lead wires, with the free ends of the leads having various shapes, for example, a "cane" shape, or

an inverted V-shape. The cane-shaped lead end is much like the J-shaped lead end produced by Radio Ceramics, and the leads may have a double bend near the free ends to bring the end into flatwise contact with the electrode layer on the ceramic capacitor. The patent states (Col. 2, line 53–Col. 3, line 6):

> * * * In many instances it′ may be desirable to provide the unit with outer lead wires 20. These lead wires are provided with U-shaped loops 22 which are soldered to the outer electrodes 12. All lead wires may be clamped in position and dipped as a unit into molten solder to effect the required soldering and electrically and physically connect the electrodes and the lead wires.

Riley, also not cited by the Patent Office, is directed to an apparatus for making disc condensers by dip soldering a plurality of hairpins leads having X-shaped ends. The leads are held intermediate the U-shaped bridge and the disc-holding X-shaped ends by a pair of clamping bars, one of which is provided with a lead gripping means comprising a strip of spring material. This is illustrated in Figs. 5 and 6:

The patent states in pertinent part (Col. 3, lines 10–26):

> * * * A second clamping bar 42 similar in size and shape to the bar 36 is adapted to seat atop the bar 36, and means on the bars are provided for clamping the bars together. This means may comprise studs 43 extend-

ing through openings in the bar 42 and cooperating with threaded openings in the bar 36.

Because of small variations in the diameter of the lead wires the plane surfaces of the clamping bars can not obtain a good grip upon each lead wire to hold each condenser properly in place. In order to correct this, I provide gripping means comprising an elongated member 44 of spring material riveted on the bar 42. As shown in Figs 2 and 4 the gripping member 44 is arcuate in transverse section and is narrower than the bar 42, whereby its side edges grip the wires between the bars when the bars are clamped together, thereby compensating for slight inequalities in the diameter of the lead wire.

The condensers are slipped between the crossed ends of the lead wires so that the lead wires engage them, and the two bars are clamped together with the lead wires therebetween to form a single readily portable assembly having the condenser body discs gripped between the lead wire ends (Col. 3, lines 44–45, 60–65). Riley states that his apparatus increases production from 3,000 to 65,000 capacitors per day per skilled worker.

Kraft, not cited during the patent application prosecution, is directed to an improved paper clip having a hairpin shape (Fig. 1 is a front view, Figs. 2 and 3 are side views):

The patent is concerned with providing an adequate grip on papers clipped together while preventing other papers

from slipping into the clip. For this latter function, the nibs 2 are provided on the wire ends. The patent describes a reverse twist method of obtaining the desired grip, stating in pertinent part (p. 1, lines 26–35 and 92–98):

> The invention further relates to a method for manufacturing the clip, according to which the legs are firstly bent so as to cross each other with two sides of the legs directed towards each other at the crossing point and thereafter bent apart and that the clip thereafter is reversed in such a manner that the opposite sides are directed towards each other at the crossing point.

> \* \* \* \* \* \*

> The clips require a minimum of material to be used, and a sufficient pressure between the legs may be obtained, if the clips in a first stage are bent to the form shown in Figure 3 and the legs thereafter are turned round to the position shown in Figure 2.

3. Defendant's patent expert, Nordhaus, also referred to a Packman patent 2,929,130, issued March 22, 1960 on an application filed July 24, 1953 which claimed priority in Great Britain as of July 28, 1952.

Packman is directed to a mass production process for manufacture of disc capacitors. The leads of Packman's capacitors are passed through perforations in flexible paper tape which keeps the condensers separate and satisfactorily mounted during manufacture as they proceed from one stage to another. One of Packman's purposes is to "prevent the comparatively flexible leads which are attached during the manufacture process from becoming entangled if a number of the components are handled at a time" (Column 1, lines 22–25), and the finished condensers "may be packed still attached to the strips" (Column 1, lines 59–60). The Packman capacitor leads are not hairpin leads, since there is no U-shaped bridge portion connecting adjacent pairs of leads, and only a single strip is used. No twist or bend of the leads is shown in this patent, and the leads are apparently soldered at their tips to the capacitor electrodes rather than being dip soldered.

However, Packman is a reference as of its U.S. filing date July 24, 1953, not the British priority date, Alexander Mil-

It should be noted that the Kraft clip is not made of soft wire; the significance of this is pointed out in the Heibel patent (Col. 2, lines 28–34):

> \* \* \* While there may appear to be some resemblance between the hairpin lead construction shown in Fig. 3 and a paper-clip, the fact that the leads 4 and 5 must be of soft wire so as to be easily bent in making connections and the length of the leads 4 and 5 makes this construction have very little of the gripping characteristics of a paper-clip.

This difference does not, however, make Kraft so-called "non-analogous" art. We are dealing here with the ability of wire to be made to frictionally grip an object, not the electrical properties of the capacitors or the chemical problems of soldering.

Defendant's final position places reliance on the Kraft British patent, the Riley patent, and the Radio Ceramics use, none of which was before the Patent Office.[3] Plaintiff merely lists this art

burn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926); In re Hilmer, 359 F.2d 859, 53 CCPA 1288, 149 USP2 480 (1966); Eli Lilly and Company v. Brenner, 126 U.S.App.D.C. 171, 375 F.2d 599, 153 USP2 95 (1969, Judge Burger). It is clear that Heibel conceived his invention sometime in November of 1952 and drawings of post-twist producing producing saw-toothed racks were made by late February 1953 (Exh. 150). These racks were in use on hand lines at Erie sometime before July of that year. Plaintiff has adequately carried its burden of removing Packman as a reference by clear and convincing evidence of Heibel's inventorship of the claimed method and apparatus in the United States prior to July 24, 1953.

Although there was other evidence presented by Plaintiff concerning a machine made for it by Swanson Tool & Machine Products, Inc., of Erie, Pa., the record is unclear whether it was made in accord with the claims prior to the Packman filing date. While it is clear that the Swanson machine did have a first clamping means, it does not appear to have had a post-twist clamp at the time in question. Plaintiff acknowledges that it was not until 1954 that a "pre-tensioner" device was

in its proposed findings, and without discussion and analysis broadly concludes that Defendant has not met the requirements of § 103.

### 2) The Differences Between The Prior Art And The Claims In Issue.

The second factual inquiry involved in the determination of obviousness or non-obviousness under 35 U.S.C. § 103 involves ascertaining the differences between the prior art and the claims in issue. In this regard, it is clear from the above that ceramic dielectrics, hairpin leads having X-shaped free ends, dip soldering, and clamping between two strips intermediate the free ends and U-shaped bridge loop are all old, and do not represent differences over the prior art.

Plaintiff, prior to and during the development of the invention in suit used hairpin leads purchased from two companies, Stewart and Noesting, and ceramic capacitor discs themselves date from the late 1940's.

Plaintiff also admitted:

a) that it knew that others had manufactured, or otherwise fabricated, condensers in the form of dielectric discs having electrodes on opposing faces and that this occurred prior to November 4, 1952 (Tr. 335);

b) that more than one year before the filing date of the Heibel patent it had formed wire into hairpin leads crosswise of a clamping strip with free ends of the leads offset toward each other in overlapping relation and spaced apart along one edge of the strip (Tr. 335–336);

c) that more than one year before the application date of the Heibel patent it manufactured disc capacitors where it inserted dielectric discs between the free ends of the leads crosswise of the strip or strips with the electrodes of the dielectric discs in contact therewith and the leads clamped against the strip, and the strips were then used as a carrier

for dipping the discs in solder to solder the electrodes to the free ends of the leads (Tr. 336–37).

An important step in determination of the differences is a review of the scope of the claims with respect to the specification and file wrapper history. In this regard, Plaintiff urges that the claims cover both pre-twisting and post-twisting methods and apparatus, and the term "twist" is to be interpreted broadly enough to cover "bending" of the leads between the free ends and the cardboard and/or tape "clamps" in the manner done by Defendant.

This interpretation creates for Plaintiff a dilemma of its own making, for to so broadly interpret the claims as to cover Defendant's construction and method would invalidate them in view of the prior art not otherwise applicable.

A patent claim cannot, like "a nose of wax," be twisted one way to avoid anticipation and another way to find infringement, White v. Dunbar, 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303 (1886); Permo v. Hudson-Ross, 179 F.2d 386 (7th Cir. 1950); claims should be construed, if possible, to uphold their validity. Automatic Devices Corp. v. Sinko Tool & Mfg. Co., 112 F.2d 335, 340 (7th Cir. 1940), aff'd 314 U.S. 94, 62 S.Ct. 42, 86 L.Ed. 65 (1941). Thus, this Court prefers to apply the rule of construing the claims in a manner to preserve their validity. And, for reasons set forth in more detail below, the Court finds that Plaintiff is estopped to urge such an interpretation in view of the file wrapper history of the patent application prosecution.

A study of the Heibel file wrapper shows that of the 15 original claims, 7 were directed to method, and of these, 4 did not recite any step of twisting or imparting a twist (original Claims 7, 8, 13 and 14). In contrast, original method Claims 9, 10 and 15 did recite applying a twist, and Claim 10 also called for

---

added to the Swanson machine. Although the Swanson machine may not be relied on to remove Packman, the hand racks,

operated in accord with the claimed method, are sufficient.

packing the finished strip. Claim 10 was cancelled during the prosecution, and after amendments, original Claims 9 and 15 became Claims 3 and 5 of the patent.

Original Claims 13 and 14, not calling for the twist, were cancelled in the applicant's response to the second official action from the examiner rejecting the claims. The other two "non-twist" original claims, Claims 7 and 8, were rewritten as a single new Claim 17, specifically calling for "applying a twisting force to the leads relative to the strip in the direction to increase the gripping force of the pairs of free ends of the leads on the intervening discs * * *". This amendment took place after an interview with the examiner, and was accompanied by the following remarks (File Wrapper, p. 40):

> Claims 7 and 8 have been rewritten as Claim 17, likewise bringing out the twisting force which is not disclosed in the references.

The amended Claim 17 became Claim 6 of the patent in suit. In addition, another method claim, Claim 16, was proposed during the prosecution after the second action. It did not positively recite any twist or twisting step, and was subsequently rejected in the Final Rejection. This claim was cancelled in the final amendment after interview.

The nature of this twist as being the post-clamping rotational type twist of the U-shaped bridge end of the hairpin lead is shown by the prosecution history of original Claim 5. This claim called for a pre-twist and single clamping, and as such covered the embodiment of Heibel patent Fig. 6:

> 5. In combination, a hairpin lead having a pair of generally parallel spaced arms with overlapping offset free ends in overlapping relation and an arched connection at the other end, *said offset ends of the arms being initially twisted in the direction to force intermediate portions of the arms away from each other and from a plane including the point of contact between the offset ends and said arch connection,* disc

condenser dielectric having electrodes on opposite faces thereof between and in contact with the offset ends of the lead and clamping means engaging said intermediate portion of the arms of the lead and forcing said intermediate portions toward each other and into said plane to increase the gripping force between the offset ends of the leads. [Emphasis supplied.]

This claim was consistently rejected by the examiner throughout the prosecution, and as a result of the interview was cancelled. Plaintiff cannot now seek to cover what was knowingly abandoned during the prosecution.

There is no evidence as to the substance of what went on at the interview with the examiner, but the art cited, showing various bends in the free ends of the leads, the claim language, and the prosecution events indicate beyond a doubt that the claims are to be narrowly construed and are limited to the post-clamping twist of the U-shaped bridge end of the leads.

The above interpretation is confirmed by an analysis of the file wrapper histories of the applications which resulted in the prior art Riley patent 3,038,242. The Heibel patent, although filed after Riley's parent application, issued while the second Riley application (a divisional application) was pending. Riley sought to provoke an interference with Heibel by copying the Heibel patent claims (two were copied with immaterial modifications). The Patent Office Examiners were of the opinion that no interference in fact existed, since Riley could not show support for means for, or steps of twisting lead wires. This view is particularly significant since the same two examiners involved in the Heibel application at the time of the Final Rejection, and presumably at the interview, were involved in this matter in the Riley application. Riley appealed the examiners' refusal and these examiners, in their Answer to Riley's Brief on Appeal before the Patent Office Board of Appeals, stated their opinion

as follows (Riley, Serial No. 417,806, 3,-038,242, File Wrapper, pp. 72–77):

It can be agreed that Fig. 4 [in Riley] shows a bending of the leads. As shown in Fig. 4, one lead 54 is placed under the disc 50 and two others 53 on top, the leads being the free ends of U-shaped wires as shown in the figure. When clamped the leads are held in slots 33 of the apparatus and forced into the same plane, thus only bending the leads. Applicant [Riley] argues that bending means to distort and twisting means to distort, therefore bending and twisting are the same and the bending shown in Fig. 4 is also twisting. *This is contrary to the usual meaning of twisting.*

Applicant [Riley] shows in the brief that twisting is defined as turning one part relatively to another about an axis passing through both. Thus twisting is caused by a torque or turning. This is the usual meaning of twist. In the [Heibel] patent in which the claims originated, the leads 4, 5 are clamped between strips 10, 11, see Fig. 10, and a twist given to the leads by members 14 and 15, see Figs. 11 and 12. As shown in Fig. 10 [of Heibel], the offset ends 6, 7 and also the arch of the U-bend are all in parallel planes, which can be called horizontal for purposes of explanation. When the members 14 and 15 act as in Fig. 11 [of Heibel], the arch of the U is turned somewhat from the horizontal and a twist is thereby given to each lead which causes a greater gripping force at the free offset ends. This can be easily demonstrated by shaping a paper clip to that shown in Fig. 3 of the [Heibel] patent, holding the parallel arms at the middle and turning the arched end of the U. *The offset free ends are rotated.*

Applicant [Riley] urges that the meaning of "twist" should not be limited to what is shown in the [Heibel] patent, but should be interpreted as broadly as possible, unless the language is ambiguous. *It is believed that the wording of the claims of the [Heibel] patent is not ambiguous and the word "twist" should be given only its fair and ordinary meaning, and therefore not so interpreted as to include bending.*

\* \* \* \* \* \*

The original disclosure [of Riley] is completely silent as to any twisting, although it can be agreed that at least one lead is bent when clamped. Applicant [Riley] argues that bending and twisting are the same, see paper No. 9, page 4, line 6. In other words, when a wire is supported at the ends and the middle forced downward, this is what applicant calls twisting. This is contrary to the usual meaning wherein a turning of one portion relatively to another portion on the same axis is understood. This is the meaning of the term as set forth in the [Heibel] patent in which the claims originated. Such twisting is not inherent in this [Riley] application and there is no teaching that it can occur. *The meaning of the term as defined in the [Heibel] patent must be followed.* [Emphasis added.]

The examiners also noted that a single strip cannot be a clamping means in the ordinary sense of the word.

That interpretation of the examiners was upheld by the Board, which stated, *inter alia* (Riley File Wrapper, pp. 90–91):

In our opinion the deformation of one of the arms of the disc device as shown in the instant Fig. 4 [of Riley] does not meet the dictionary definition of the term "twist" since there is no torsional movement of one part of an arm relative to another about an axis extending through both.

\* \* \* \* \* \*

\* \* \* Spring member 44 of appellant's [Riley's] Fig. 4 presses downwardly on the leads of the disc device forcing them into contact with the flat surface of block 36. These forces acting on the leads *cannot* set up torsional stresses in the leads which would be

necessary to cause a twisting of each lead. [Emphasis supplied.]

The Board also found that in Heibel, both arms are simultaneously twisted, and the twisting and clamping means "obviously" require *two* separate means—they cannot be one and the same (Riley File Wrapper pp. 89–90). The latter confirms this Court's view that the pre-twist embodiment of Heibel is not covered by the patent claims.

The Heibel patent file wrapper also reveals that patent coverage of the article itself, the strips carrying the condensers, was sought (original Claims 6 and 12). These claims were rejected over several references, including the Fowler patent, and were cancelled in the second amendment. Thus, advantages of the article itself are not particularly relevant or persuasive as to validity of the method and apparatus claims in issue.

A difference which the examiners apparently considered significant in Heibel is illustrated by the history of original Claim 11. This claim refers back to and includes everything in original Claim 1, and further calls for the first clamping means as comprising a pair of flexible strips fastened together. It was eventually allowed without amendment as patent Claim 4, here in issue.

The Court concludes that the key differences over the prior art of record here are: 1) the pair of carrier strips as the first clamping means, 2) the post-clamping twist of the U-shaped bridge end of the hairpin, and 3) the combination of the twist with the clamping between the free ends and U-shaped bridge end of the leads.

*3) The Level of Ordinary Skill*

The third inquiry required under 35 U.S.C. § 103 is that of determining the level or ordinary skill in the art at the time the invention was made. This is shown in part by testimony of the experts as to their opinion of what the level would have been, and as such is taken as advisory to the Court. It is also shown in part by the testimony of the relatively contemporary work at Radio Ceramics, and what they were doing in the manufacture of the capacitors. The level is also shown in part by the direction of the prior art solutions to problems in the art, and by the skills and abilities of the work done by the Swanson Co., which is presumably unpatented.

A review of the evidence shows that while the level of skill was such that those of ordinary skill in the art had the capability for carrying out Heibel's solution to the problem, *once shown*, their own abilities were directed to simple clamping, or bending of leads adjacent the disc, and not to the combination of clamping plus twisting remote from the disc. Likewise, the same is true of the use of a pair of flexible carrier strips as clamping means in conjunction with a second, separate clamping means for imparting the twist. Though no special "skills" were employed or specially developed by Heibel, the record shows his "skill" of recognition and discovery was above that of those of ordinary skill in the art.

*4) The Obviousness Or Non-Obviousness Of The Subject Matter As a Whole.*

 Defendant has not overcome the presumption of validity of the Heibel claimed invention, 35 U.S.C. § 282, by clear and convincing evidence. Within the construction of the Heibel claims accorded above to cover a particular method and apparatus for twisting the leads as distinct from bending, the subject matter of Heibel's method and apparatus claims as a whole is not obvious within the meaning of 35 U.S.C. § 103.

For the most part, the same or equivalent prior art was before the Patent Office. With respect to the Riley patent, not before the Patent Office, it teaches and suggests no more than what Plaintiff has admitted is old—that a single set of clamps may be used with X-end hairpin leads which may or may not be bent near their terminal ends. It is not particularly directed to the problem of *increasing* the grip to prevent a substantial loss of ceramic discs. Rather it is directed more to mechanical apparatus

for assembling condensers, not employing the combination of a twist and an intermediate clamping member. It also does not suggest the substitution of the cardboard strips in place of its spring material.

With respect to the Kraft British patent, while applicable art, it does not suggest the twist method or apparatus of Heibel. Were Heibel's claims to cover the pre-clamping twist of the leads in the manner of his Figure 6, a strong case for obviousness would be shown by the Kraft reference. However, such twist is not included in the monopoly grant of the claims in issue, and Kraft does not suggest the twist of both the leads by the U-shaped bridge end remote from the disc in combination with an intermediate clamping action or member.

Defendant's position seems best summarized as the following: 1) all but the application of a twisting force to the leads is old and that was done at Radio Ceramics, or 2) the Radio Ceramics work is the rationale or teaching that permits the combination of Kraft with Riley, which renders the claimed subject matter obvious.

The Court cannot agree. The testimony of the Radio Ceramics method was not so completely and unambiguously clear as to be convincing of prior public use or knowledge of precisely the twist used by Heibel. Quite simply, Defendant has not carried its burden of proof in the matter. Without this teaching, the combination is mere hindsight. Further, even if combined, the twist of Kraft is not that called for by the claims and does not suggest the Heibel twist. Marks does not suggest the Heibel twist nor the combination. Nor do the remaining references, already considered by the Patent Office, supply the deficiency in the combination.

## INFRINGEMENT

The evidence shows that Defendant's machines, the "Wyr-Former" and "Disc Loader" do not infringe the apparatus claims in suit since they bend rather than twist the hairpin leads. Further, the

bending is accomplished on each of the two leads independently, albeit simultaneously, by bending the leads near their free ends rather than at the U-shaped bridge. In the Heibel twist, the interconnecting bridge cooperates in the twisting movement thus providing for the action that transmits the increased gripping force to the free X-ends. This is not the case in the "Wyr-Former" machines of Defendant. Of course, only Defendant's machines equipped with "X-formers" are of concern here since the claims exclude unbent round, flattened, or so-called "spoon shaped" free ends.

Indeed, the bending used by Defendant appears justified by the prior art, for example, Ehrhardt et al, Herrick, Marks and Riley, and Defendant's use of a cardboard strip and paper adhesive tape in place of two cardboard strips is justified by the Fowler patent. To the extent that the "Wyr-Former" bend might cause a vertical twist of the arms at the bridge part of the lead, it is justified by the Kraft British patent.

At the completion of Plaintiff's case in chief, counsel for Plaintiff, Mr. Hammar, stated:

Now, as to the direct infringement, there is no evidence that I can find that Die Craft made capacitors and, therefore, no direct infringement by Die Craft of the method claims.

THE COURT: Then you do charge direct infringement of the method. You concede now there is no evidence?

MR. HAMMAR: I haven't gotten any yet.

THE COURT: Well, if you haven't got any yet at the close of your case I will have to rule now there is no direct infringement of the method claims and I so find. (Tr. 434)

Defendant urges that accordingly the issue of direct infringement of the method claims is removed from further consideration and that absent direct infringement contributory infringement and inducement cannot be found.

Defendant misconstrues the Court's ruling. The Court ruled merely that De-

fendant itself did not directly infringe the method claims. It is clear that Defendant makes two machines: 1) a wire forming apparatus for forming the leads into hairpins, bending ("pre-tensioning") them, and securing them to strips with tape, and 2) a disc-loading device for inserting the ceramic capacitor discs between the lead ends. The evidence shows that Defendant tests the wire forming machine, but does not go so far as to insert discs or solder them.

However, it is clear from the Defendant's brochures and manuals that its customers do insert discs and solder. Indeed, Plaintiff itself is one, and Rubinstein testified that his company, Sprague of Wisconsin in Crafton, Wisconsin, used the "Wyr-Former" and "Disc Loader" devices of Defendant to manufacture disc capacitors. The direct infringement necessary for showing contributory infringement or inducement is not restricted to the acts in this disrtict or by this Defendant. Aro Manufacturing v. Convertible Top Replacement Co., 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). But for the fact that Defendant's machine (with an X-forming attachment), when operated in accordance with its instructions, cannot infringe, since they bend rather than apply "a twisting force" to the leads, there would be the prerequisite direct infringement of method by use of the machines necessary for contributory infringement and inducement of infringement. However, since there is no direct infringement by others by their use in the United States of Defendant's accused machines, no contributory infringement or inducement of infringement is proven.

Defendant argues that Plaintiff may not enforce the patent due to its laches. Plaintiff in turn argues that Defendant's agreements to hold its customers harmless are acts of contributory infringement or inducing infringement. Neither of these positions have merit. Defendant has not convincingly shown that the Plaintiff's purchase and/or use of Defendant's machine by Plaintiff is the representation required for laches or

equitable estoppel. Defendant also has not established the elements of detrimental reliance. Likewise, Plaintiff has not shown that Defendant acted in bad faith in giving the hold harmless agreements to its customers, or that, as a matter of law, such agreements amount to inducement to infringe.

The complaint for infringement is dismissed, and Defendant will prepare a Judgment Order in accord with the foregoing opinion specifically identifying the types of devices accused to be infringed.